Suñol *v.* Hepburn.

SUÑOL *et al. vs.* HEPBURN *et al.* (*a*)

(*a*) The case of *Suñol* v. *Hepburn* and the next succeeding case of *Woodworth* v. *Fulton* were argued twice; a re-argument having been ordered by the court for the reasons mentioned in the subjoined opinion of

BENNETT, J. In these cases a re-argument is ordered. Opinions have been prepared in both cases, but the court thinks that the questions involved in them are of so great importance, that it is advisable to have them re-argued. In both cases the question of *possession* is involved. What constitutes *actual possession* under the Mexican, and what, under the common law? One member of the court is of the opinion that there was no *actual* possession in either case, which can enable the plaintiffs to maintain their action.

In the case of *Suñol* v. *Hepburn,* the validity of a transfer of land by an Indian is another important question—and in that of *Woodworth* v. *Fulton,* the validity of all grants of lots in San Francisco by Alcaldes and the Ayuntamiento—and in both cases, one member of the court is of the opinion, that a transfer by an Indian, and grants by Alcaldes, and by the Ayuntamiento of San Francisco, are insufficient to give even a colorable claim of title.

## Suñol v. Hepburn.

One who is in the actual possession of land cannot, by process of law, be dispossessed by another who has neither title, nor color of title.

A possessory action cannot be maintained under Mexican law by a person who has acquired his title subsequent to the intrusion complained of.

The possession of a party, who has neither title nor color of title, does not extend beyond the metes and bounds of his actual occupation; and this is so according to Spanish and Mexican, as well as English and American law.

The fact that cattle and horses of a person have roamed over, and grazed upon, a particular tract of land, does not, of itself alone, make out an actual possession of the land in him.

The actual possession of a small portion of a large tract of land, with a claim of title to the whole, will not enable a party to maintain a possessory action under Mexican law, where it appears on the face of the papers, by virtue of which he claims, that his title is a nullity.

A deed of conveyance from an Indian to a white person is a nullity on its face, and no one can derive title under it. Such a conveyance is contrary to the policy of Spanish and Mexican, as well as American law, and is strictly forbidden.

Where a deed of conveyance is void upon its face, as being in violation of law, the *party claiming under it is chargeable with knowledge of the law*, and of the invalidity of the deed; and this is the rule in Mexican as well as in American law. In such case the party does not even derive a color of title, which will give him constructive possession of a tract of land beyond his actual occupation.

The policy of Spanish and Mexican law, prohibiting sales of land by Indians, considered. *Per* BENNETT, J.

The Plan of Iguala, and the Mexican constitutions of 1836 and of 1843, and the decrees of 1812 and 1813, did not remove the restrictions on alienations of land by Indians.

The sovereign power may, in disposing of the national domain, annex such conditions to a grant as it sees fit; and in such case, a restriction against alienation inserted in a grant and authorized by law, will not be held void on the ground that it is against the policy of law.

Under Mexican law, the approbation and consent of the government was necessary to make a conveyance of land by an Indian to a white person, valid; and such consent being wanting, *held,* that a conveyance was void upon its face, and transferred no title, and that the party claiming under it was chargeable with knowledge of its invalidity.

*It seems,* that by the civil law, a party cannot maintain a *possessory* action, when he has no title, unless he has been evicted by force, fraud, violence, or artifice: but if he has been thus evicted, he will be entitled to be restored to possession, without inquiring whether he has title. *Per* BENNETT, J.

A party cannot, by the Mexican law, *acquire* possession beyond the metes and bounds of his actual occupancy, unless he claims to hold under what is termed a *just title; (titulo justo;)* and a deed, void on its face, is not a *just title.*

It is essential to the validity of a deed, that there should be a legal capacity in the grantor to convey, and in the grantee to receive; and if either be wanting, the instrument is invalid.

HARVARD LAW LIBRARY

APPEAL from the court of First Instance of the district of San José. The action was brought by Antonio Suñol, Pedro Sansevaine and Henry M. Naglee against James Hepburn, William Stewart and Charles Stewart, to recover possession of a lot of land, situated in the valley of San José. The action was brought and the judgment rendered before the passage of the statute adopting the common law, and was what is designated in the civil law as a possessory action. The complaint alleged that the plaintiffs, and those through whom they claimed, had been for more than three years in peaceable, public and uninterrupted possession of a certain *Rancho*, known as " *De los Coches*," of which the lot in controversy was part. The whole tract, as it appeared, contained upwards of 2000 acres. The defendant Hepburn had entered and taken possession of a small portion of it, and built a house thereon, and taken up his residence there, claiming that the land was part of the public domain of the United States. The plaintiffs, or one of them, had been in possession of small portions of the large tract for some time previous to the entry of the defendants, but it did not appear that either of them had ever had the actual possession of the particular parcel of land in controversy. At the time of the entry of the defendants the lot was unfenced, and uncultivated, and presented no external signs or indications of being owned or claimed by any one. It appeared, in truth, to be unoccupied wild land.

The plaintiffs, for the purpose of showing their possession of the lot, gave in evidence at the trial their title; they being unable to make out possession on their part except through the medium of their title. This was derived from a grant made by Governor Micheltoreno to an *emancipated* Indian by the name of Roberto. The grant was in the usual form of grants by the government of public lands, excepting that it contained a clause prohibiting Roberto from selling, aliening, mortgaging, pledging, or incumbering or disposing of the land in any manner whatever. The clause was in the following words:—" *No podra venderle, enagenarle, hipotecarle, ni imponer censo, vinculo, fianza, hipoteca, ni otro gravamen alguno.*" Roberto after-

Suñol *v.* Hepburn.

wards became indebted to Suñol in the sum of $500, and conveyed to him the Rancho by a deed dated January 1st, 1847, in payment of the debt, and Suñol conveyed an undivided portion to the other plaintiffs by a deed bearing date the 15th day of December, 1849. The entry of Hepburn on the lot in question appears to have been made before the date of the last mentioned deed. There was no evidence showing any cause of action whatever against the co-defendants of Hepburn. The cause was tried before a jury who were unable to agree, and a verdict was taken in favor of the defendants by stipulation, to be of the same force and effect as if it had been rendered by the jury. Judgment was accordingly entered against the plaintiffs, from which they appeal.

*J. M. Jones* and *A. C. Crittenden*, for plaintiffs.

*R. A. Lockwood*, for defendants.

*By the Court*, BENNETT, J. On the first argument of this cause my impressions were strong, that the plaintiffs ought not to recover, and, if it had been an ordinary case, I should have had no hesitation in so deciding at once. I was not entirely satisfied, however, but that, on a re-argument, additional authorities might be adduced, which would leave the case without doubt in the minds both of myself and my associates. I felt, also, in common with the chief justice, that there was a possibility that I might have been led into error. I thought, therefore, that the case was a proper one for re-argument, and that the attention of counsel should be called to the particular points concerning which some doubts were entertained by the court. I was the more inclined to this course, inasmuch as the cause was not argued before a full bench, and from the conviction that a decision, which must not only settle the rights of the immediate parties to this suit, but which may determine great and important interests in all parts of the state, should receive the deliberation, and, if possible, the sanction of all the members of the court. The re-argument was, accordingly, ordered, and

has taken place; and the impressions which I entertained after the first hearing, have been ripened into conviction. Nothing, therefore, remains but to announce the opinion which I then had prepared.

The cause was tried in the court of First Instance of San José, before a jury. The jury were unable to agree; and the parties stipulated that a verdict should be entered in favor of the defendants, saving to the plaintiffs the same rights which they would have had, in case the jury had actually rendered a verdict for the defendants. In strictness, this stipulation should be regarded in precisely the same light as a verdict, and should, in this court, be followed by the same legal results. I shall, in the first place, examine the case as I should be disposed to treat it, had it been tried and the stipulation entered into under the system of practice which exists at present, and, then, consider whether there are any circumstances which should be allowed to control what would otherwise be the legal effect of the stipulation.

The claim of the plaintiffs for the destruction of certain huts mentioned in the complaint, may be dismissed from consideration. The stipulation above mentioned, standing in the place of a verdict, and finding as it does, one cent damage in favor of the defendants, puts an end to that matter.

The defendants Charles Stewart and William H. Stewart are, also, easily disposed of. If it is intended to charge them with taking possession of one or more parcels of land distinct from the lot on which Hepburn entered, the claim against them should not have been included in the suit against him. If they are sought to be made joint possessors with Hepburn, the complaint is unsustained by proof. In either event, the judgment of the court of First Instance is correct, and should be affirmed with costs.

The important point, presented by the papers and argued at the bar, affects the defendant Hepburn alone. Before proceeding, however, to examine the claim of the plaintiffs against him, it is to be observed, in the outset, that no question can be made, whether the acts of Hepburn are sufficient to constitute posses-

Suñol *v.* Hepburn.

sion on his part or not; for, the suit is based solely upon the hypothesis that the affirmative is true. If he was not in possession, then, surely, there could be no cause of action against him, and the judgment in his favor would be correct. The plaintiffs cannot gainsay his possession without destroying their own case.

This is a possessory action. It is based solely upon the ground that the plaintiffs were in possession of the land on which Hepburn entered at the time of his entry, and not upon the ground that they held the property or dominion therein by a valid title. This is the proper construction to be given to the complaint, and this is the view taken by the counsel of both parties in their arguments and briefs.

As, in American law, a party, to maintain his ejectment, may rely on the strength of his title, or simply on prior actual possession, which, if his title does not appear to be defective, may enable him to sustain his action, so, under the Mexican system, a party may have his possessory action, in which the possession of the plaintiff and the disturbance thereof by the defendant may be the sole questions at issue between the parties, or he may have his petitory suit founded on the claim of an indisputable title. Under the latter system, possessory suits are either plenary, being such as are prosecuted and defended in the manner and with the formalities of ordinary judicial proceedings; or summary, also termed interdicts, which are conducted without the solemnities of ordinary suits, are terminated within a short period, and either admit of no appeal, or only of an appeal without suspension of the execution of the judgment. (4 *Feb. Mej.* 271, *sec.* 1, *Ed.* 1834; *Escriche Dic. de Leg. Art.* " *Juicio Posesorio.*") Whether this suit belongs, technically, to one class or the other of civil law proceedings, whether it is to be deemed a possessory action under the Mexican law, or an action of ejectment as understood in the United States, and there seems to be a mixture of the forms of both species in the proceedings, can be a matter of but little moment. The result is the same. In any event the question to be determined is one of possession.

To enable the plaintiffs to maintain the action they must establish two facts : 1st, that they were in actual possession at the time of the intrusion complained of; and 2d, that they are entitled to be reinstated in the possession from which they claim to have been illegally evicted. It results from this, that, if they were not in possession at the time of the defendant's entry, they have never been in a position which could enable them to maintain this suit. How, then, stands the case in this view ?

The action on the part of the plaintiffs is joint, and all must recover, or neither can. It must, consequently, appear that, at the time of Hepburn's entry, Suñol, Sansevaine and Naglee were jointly possessed of the lot in controversy. The deed from Suñol to Sansevaine and Naglee was executed on the fifteenth day of December, 1849, and thus, up to that time, the two latter had neither possession, nor right of possession, nor claim of title. If, previous to that date, either of the plaintiffs was in possession, it was Suñol alone. The conveyance to Sansevaine and Naglee cannot carry back their possession, either severally, or jointly with Suñol, beyond the period when they derived their title under it, and any entry on the land prior to the fifteenth day of December could not have been an intrusion on the possession of Sansevaine and Naglee.

It thus becomes material to determine the precise date of Hepburn's entry. The complaint charges it to have been on or about the twentieth day of November, 1849. The testimony, though not entirely clear on the point, one witness stating that as late as the fourteenth day of December, Hepburn had no *house* on the land, nevertheless pretty fully establishes the fact, that the defendant had taken possession as early as the day alleged in the complaint. The apparent discrepancy in the testimony is attempted to be explained on the ground, that Hepburn's tent was, at first, pitched on the reserved space of twenty *varas* lying between the *Alameda* and the land claimed by the plaintiffs, and that he did not move within the bounds of the tract in question until after the conveyance to Sansevaine and Naglee. This, if so, does not negative the idea of his having

been in possession of the entire one hundred and sixty acres in addition to the strip of twenty *varas*. He undoubtedly took possession of the whole at the same time. But this was a question for the jury to determine. They, certainly, might legitimately infer from the evidence, that the defendant's entry was made prior to the fifteenth day of December; and, a general verdict having been taken by stipulation in favor of the defendant, we cannot, from the testimony before us, find the very opposite of the conclusion to which we are bound to suppose the jury arrived.

The possession, then, on which the defendant intruded was that of Suñol alone, and not the joint possession of Suñol, Sansevaine and Naglee, and they cannot maintain a joint action solely on the ground of prior possession. If the defendant is guilty of a wrongful detention of the premises after the acquisition of title by Sansevaine and Naglee, a suit for the recovery of them can be sustained only upon proof of *title* establishing the *right* of possession, and, perhaps, also, a demand, or some act equivalent thereto, which shall put Hepburn in the position of a wrong-doer in respect to Sansevaine and Naglee equally with Suñol.

Perhaps I ought to leave the case here, without reviewing the other points made on the argument; but a consideration of the magnitude of the interests depending, immediately and remotely, on the result of this case, induces me to proceed in the investigation upon the assumption that Sansevaine and Naglee had received the conveyance to them before the entry of the defendant. In such event, the possession of either of the plaintiffs would have been the possession of all. The question then is, had they such a possession as will enable them to maintain this action.

The *judicial possession* may be laid entirely out of the case. It amounts to nothing. It is doubtful whether it was taken before Hepburn's entry. It is not proved in the way that a judicial proceeding should be proved; and, if it were, it does not appear to have been conducted with the formalities required by the Mexican law.

It is clear that the plaintiffs never had the actual *pedis possessio* of the one hundred and sixty acres in controversy. The cattle and horses of Suñol, it is true, roamed over, and grazed upon, portions of the large tract ; but this is altogether too slight a circumstance, on which to found a claim to wild, uncultivated, and unfenced lands, unless it be also shown, at the same time, that such cattle and horses were restricted by keepers or otherwise within definite boundaries. If a claim to this lot could be thus sustained, we see no reason why it might not be extended to the greater portion, if not the whole, of the valley of San José.

Indeed, the case of the plaintiffs is not rested on the ground of *actual* possession of this identical lot, or of any part of it. It is sought to be supported by the fact, that some small portions of the whole tract of two thousand acres and upwards, had, at different times, been cultivated by the plaintiff Suñol, and by the Indian Roberto, under whom he claims ; that one, or both of them, had a *corral* upon it, and some buildings ; and that these circumstances, and others of a similar character, give them, in contemplation of law, the possession of the whole tract described in the grant from the Mexican governor to Roberto. The question, then, is, whether an actual occupation of an inconsiderable portion of a large tract of land is such a possession of the unoccupied portions of the same tract, as will support a *possessory* action under Mexican law ; and, if so, in what way is the possession of the unoccupied portions to be established.

In Mexican law, possession is the occupation of a corporeal thing. It is divided into possession in fact, (*de hecho,*) and possession in fact and by the will, (*de hecho y de voluntad.*) Possession in fact is nothing more than a simple holding or detention of a thing, which is under our control, without the intention of acquiring the thing for ourselves ; such is the possession of a bailee, a tenant, and others, who possess a thing in the name of another, and not in their own. The possession in fact and by the will, is the holding of a thing with the intention of excluding all others from its use, or, as it is expressed in the *Partidas*,

that holding or detention, which a man has of things corporeal, by the aid both of the body and the mind. This latter species of possession is divided into natural and civil. Natural possession is that which consists in the detention of a thing itself corporeally, as one's house or estate; and civil possession consists in the detention of the thing mentally, as when one departs from his house or estate without the intent to abandon it. True possession comprises both natural and civil, and results from some regular title, (*justo titulo*,) that is, a title sufficient to transfer the property. To acquire possession, there is necessary the will or intention to acquire it, and the occupation or actual detention of the thing, either corporeally or symbolically. The above is the general definition of the term possession in Spanish and Mexican law. (*Escriche, Dic. de Leg. Art. "Posesion;"* 1 *Feb. Mej.* 349, *sec.* 45; *Leyes*, 1, 2, *and* 6 *of tit.* 30, *Part.* 3; *Instituciones de Asso y Manuel, lib.* 2, *tit.* 2, *sec.* 5, 6, 7, *page* 185 *of Madrid Ed.* 1785; 1 *White's Comp.* 93, 94; 2 *id.* 84, 85.) Actual possession is that which is accompanied with the real and effectual enjoyment of an estate with the reception of its fruits, and is contradistinguished from imaginary or fictitious possession. (*Escriche, Dic. de Leg. Art. "Posesion actual."*) Possession of real property is lost, if the possessor is evicted by force; if, when he is not present, another enters on it and prevents his re-entry; and if, seeing that another enters on his property, he submits to it, and does not drive out the intruder; but in neither of these cases does he lose the dominion. (*Instituciones de Asso y Manuel*, as above cited; *Escriche, Dic. de Leg. Art. "Posesion."*)

The above rules respecting possession in Spanish and Mexican law do not differ materially from those of the French law. It is necessary, says Domat, to distinguish in the general idea which is formed from the word possession, a right and a fact; the right to possess, and the actual detention, which is a fact. (1 *Domat, lib.* 3. *tit.* 7.) Possession taken in a proper sense, is the detention of a thing, which he, who is master of it, or who has reason to believe that he is so, has in his own keeping, or in that of another person by whom he possesses. (*Id.* 460,

*lib.* 3, *tit.* 7, *sec.* 1, *art.* 1.)   Again, the same writer says, that
possession implies a right and a fact ; the right to enjoy annexed
to the right of property, and the  fact of the real detention of
the thing, that it be in the  hands of the master, or of another
for him.   (*Id. lib. 3, tit.* 7, *sec.* 1, *art.* 2.)   Again, one may
possess corporeal things whether they be moveables or immovea-
bles, but, according to the differences of their nature, the marks
of the possession of them are different.   Thus, one may possess
moveables, by keeping them under lock and key, or having them
otherwise at one's disposal.   Thus, one possesses cattle, either
by shutting them up, or giving them to be kept.   Thus, one
possesses a house by dwelling in it, or trusting it to a tenant, or
building in it.   Thus, one possesses lands by cultivating them,
reaping the fruits, going and coming through them, and disposing
thereof at pleasure.   But although possession implies the de-
tention of what we possess, yet this detention ought not to be
understood, as if it were necessary to have always either in our
hands, or in our sight, the things of which we have possession.
But after the possession has been once acquired, it is preserved
without an actual detention.   The honest and fair possessor is
he, who is truly master of the thing which he possesses, or *who
has just reason to believe that he is so*, although it may happen
in effect that he is not so ; as it happens to  him  who buys a
thing, which he thinks belongs to the person whom he buys it
of, and yet belongs to another.   The natural connexion, which
is between the possession and the  property, makes the law to
presume that they are joined in the  person of the possessor ;
and until *it be proved that the possessor is not the right owner*,
the law will leave him, *by the bare fact of  his possession*, to be
considered as such.   For, seeing it is the owner who  ought to
possess, it is natural to presume that he who is in possession is
also the right owner, and that the  right owner has not suffered
himself to be turned out of possession.   It follows from this
rule that all possessors ought to be maintained in their posses-
sion and enjoyment of the thing, until they who trouble them
in their possession, prove clearly their right ; and if *a demand
against a possessor is not grounded upon good and sufficient*

*titles,* it is enough for the possessor to allege his possession, without producing any other defense. (*Domat, lib.* 3, *tit.* 7, *sec.* 1, *arts.* 4, 6, 11, 13, 15.)

Argou, in his *Institution au Droit Français,* (*lib.* 2, *chap.* 9—*tom.* 1, *p.* 221–8,) in treating of possession, says, that " he " who has the possession of a thing, although he may not be the " true proprietor, has a great advantage over those who are not " in possession. If he is molested in his possession, after " having possessed for a year and a day, he has an action by " which he is maintained in his possession. The possessor is " not obliged to show the title to his possession, and when it is " demanded of him by what title he holds, it is sufficient for " him to say, I possess, because I do possess. Possession, " purely natural, is a simple detention of the thing, without " any intention to possess it in the quality of proprietor. " Civil possession is the detention of the thing, accompanied " with the design of possessing in quality of proprietor. Al- " though this possession cannot be acquired by the sole inten- " tion of him who wishes to possess, without a real and actual " possession, it can be retained by the intention alone of retain- " ing it. Whilst I dwell in my house, if I go forth with the " intention of returning, I retain the civil possession, &c. But " from the moment when a man has been evicted by *force and* " *violence,* he ceases to possess, but has an action, which he " can institute within a year and a day, for being restored to " the possession of which he has been deprived *by force.*" Cocceji, in his commentary on Grotius, (*lib.* 2, *cap.* 3, *sec.* 11 —*tom.* 2, *p.* 154,) thus defines possession. Possession, he says, consists in detention, and, therefore, is a bodily act ; and in the intention to possess ; one of these two failing, possession ceases, and therefore the intention alone is not sufficient.

It is laid down in the Institutes of Justinian, (*lib.* 4, *tit.* 15, *sec.* 5,) that a possession may be *retained* by the mere intention only ; for, although a man is neither in possession himself, nor any other for him, but has quitted the possession of certain lands with an intent to return to them again, he shall, nevertheless, be deemed to continue in possession ; but that, although posses-

sion may be *retained* by intention only, yet this is not sufficient for the *acquisition* of possession.

But the clearest exposition of the doctrines of the civil law in relation to possession is to be found in the Louisiana code, which, in most, though, I apprehend, not in all particulars, is only declaratory of the principles of the civil law in those countries where it prevails. By that code, possession is defined to be the detention or enjoyment of a thing, which we hold or exercise by ourselves, or by another who keeps or exercises it in our name, (*Art.* 3389;) and, in unison with the authorities above cited, it divides possession into two species, natural and civil. (*Art.* 3390.) Natural possession is that by which a man detains a thing corporeal, as by occupying a house, cultivating grounds, or retaining a moveable in possession. (*Art.* 3391.) Possession is civil, when a person ceases to reside in the house or on the land which he occupied, or to detain the moveable which he possesses, but without intending to abandon the possession. (*Art.* 3392.) Natural possession is also defined to be the corporeal detention of a thing, which we possess as belonging to us, without any title to that possession, or with a title which is void. (*Art.* 3393.) Civil possession, on the contrary, is defined in this sense, as being the detention of a thing by virtue of a *just title, and under the conviction of possessing as owner.* (*Art.* 3394.) Possession implies a *right and a fact;* the right to enjoy annexed to the right of property, and the fact of the real detention of the thing, that is in the hands of the master or of another for him. (*Art.* 3397.) To be able to acquire possession of a property, two distinct things are requisite; 1. The intention of possessing as owner; 2. The corporeal possession of the thing. (*Art.* 3399.) It is not necessary, however, that a person wishing to take possession of an estate, should pass over every part of it; it is sufficient, if he enters on and occupies a part of the land, provided it be with the intention of possessing all that is included within the boundaries. (*Art.* 3400.) When a person has once acquired possession of a thing by the corporeal detention of it, the intention which he has of possessing, suffices to preserve the possession in him,

Suñol *v.* Hepburn.

although he may have ceased to have the thing in actual custody, either himself, or by others. (*Art.* 3405.) The intention of retaining possession is always supposed, where a contrary intention does not appear decidedly; so that, although a person may have abandoned the cultivation of his estate, he shall not, therefore, be presumed to have abandoned the possession, but shall be presumed, on the contrary, to have the intention of retaining it, and shall retain it in fact. (*Art.* 3406.) One of the rights which is common to possessors is, that every person, who has possessed an estate for a year, and is disturbed in it, has an action against the disturber, either to be maintained in his possession, or to be restored to it, in case of eviction. (*Art.* 3417, *Sub.* 2.)

From the authorities above cited it will be seen, that the Mexican law, adopting the principles of the Institutes and Pandects of Justinian in relation to possession, does not differ materially from the laws of France and Louisiana, which have also derived their doctrines on this subject from the same original source. Neither does it differ essentially from the common law rules concerning possession. The natural possession, the actual and real possession, the possession in fact, spoken of in the authorities cited, appear to be but other names for what is termed in the common law, actual possession; and the civil possession, the possession by the mind or intention or will, appear to be but different forms of expression for the constructive possession of the common law—that is, a possession, not actual and corporeal, and readily manifest to all people, but one which is to be made out through a deduction of title and by a process of reasoning. It must, however, be observed, that the lines and colors of the different species of possession, whether in the civil or the common law, so intermingle and blend together, according to the infinite variety of circumstances, that it is quite impossible to frame any general rule or precise definition by which the character of each successive case, as it arises, can be readily and accurately determined. But I think that the possession of the plaintiffs, as claimed by them in this case, partakes rather of the nature of civil than of corporeal possession, under the definitions of Mexican law, and of constructive rather than of

actual possession, as these terms are used and understood in the common law. And, I am further of the opinion, that, unless it shall appear, that the plaintiffs claim to hold under what is termed in the authorities above cited *just title*, a question which will hereafter be considered, they cannot be deemed to have ever *acquired* possession beyond the precise limits of their actual and corporeal occupation.

Having thus seen the general characteristics of the different kinds of possession, let us next direct our attention to the inquiry, as to what is the kind of possession and the nature of the intrusion, which will enable a party to maintain a possessory action.

By the Louisiana Code of Practice, (*Art.* 49,) it is declared that a person, to be entitled to bring a possessory action, should have had the *real and actual* possession of the property, at the instant when the disturbance occurred; a mere *civil or legal* possession is not sufficient.

The Institutes of Justinian, (*lib.* 4, *tit.* 15, *sec.* 4,) treating of proceedings concerning contested possession, declare that, in any cause, either concerning things moveable or immoveable, that party prevails, *who was in possession at the commencement of the suit*, if it be not shown that he gained such possession *by force, by clandestine means, or precariously.* Again, it is said, (*id. ibid. sec.* 6,) that the interdict for the recovery of possession, is generally employed, when any one hath been ousted *by force* from the possession of his house or estate; who then becomes entitled to the interdict *Unde vi*, by which the intruder is compelled to restore him possession, although he, who had been thus forcibly ousted, was himself in possession by clandestine means, by force, or *precariously.*

The possessory action of the Mexican law seems to be subject, in some cases at least, to the same rules. It is brought to recover possession of immoveable property, of which one has been despoiled (*despojado*) by another. The word despoil (*despojar*) involves, in its signification, violence or clandestine means, by which one is deprived of that which he possesses. (*Escriche, Dic. de Leg. Arts.* "*Despojo*;" "*Despojar*;" "*Interdicto de recobrar la posesion*;" 4 *Feb. Mej. p.* 273, 274, *sec.* 8

Suñol *v.* Hepburn.

*to* 18.) The latter work says, that the interdict for the recovery of lost possession is most favored by the laws ; public tranquillity requires this, for the reason that, without such remedy, there would be continual despoliations, (*despojos.*) And, in speaking of a regulation of the *Audiencia* of Mexico respecting proceedings in case of persons deprived of, or disturbed in, the possession of any thing, and providing for the determination of their claims to the property or dominion, it says, that this regulation is to be understood as applicable, where the person complained against is a possessor in good faith, and has not despoiled the other of the thing *clandestinely or by force ;* because, if he has deprived him of it *in this manner*, whatever be his title, the one who is despoiled, his heirs and successors, ought, first of all, to be restored to the possession, without citation of the offender, although the latter may wish to prove, or may prove immediately, his ownership ; for his claim must be reserved to be established in the appropriate action, which is the petitory. (*p.* 274, *sec.* 8, 9, 14.) Again, in sections ten and eleven, the author says, that the injured party may pursue his remedy by way of action, or by way of exception ; and that he is permitted to make use of the latter remedy against the despoiler, or him who has advised the despoliation, or possesses or has received the thing, knowing that it had been *seized by force*, (*quitada por fuerza,*) &c. In section 12, he says, that this, the possessory form of proceeding, belongs to the injured party against any one, who is over twenty-five years of age and is capable of making *clandestine or forcible entry* on land, (*despojo violenta ó clandestinamente,*) &c. ; and that, if one *takes by force*, (*quita por fuerza,*) his own property from another, or in which he has any interest, he loses that interest which he may have in it.

In the Louisiana Code it is laid down, that a possessory action may be sustained where the eviction was by " force or otherwise ;" but in *Meeker* v. *Williamson*, (4 *Martin, Rep.* 626,) decided in 1817 and before the adoption of the code, the court uses the following language : " The plaintiff proving that he " was in possession, and ousted by violence, fraud, or artifice,

" becomes entitled to recover possession at once." In *McDonough* v. *Childress et al.*, (15 *Louisiana Rep.* 556–559,) the counsel for the defendant says, *arguendo*, that the reason for the distinction in the 49th ART. of the code of practice, which gives the possessory action to one species of possession and denies it to the other, is perfectly obvious; it is given, he adds, to redress a *physical* injury and prevent the *violence*, which would otherwise take place; whereas a disturbance of *mere legal* possession does not produce danger of violence, nor require so prompt an action to redress it.

The authors, to whom I have above referred, both in reference to the nature of possession in general, and the different species of it, by virtue of which such an action as the present may be sustained, appear to me to be in conflict, not only, each with the other, but each with himself; and the only way in which I can reconcile their apparent contradictions, is by the following conclusions :—1. That, in case the party can make out his possession by showing an actual occupancy, without resorting to an exhibition of his title, then, although he may have no title whatever, yet, if he can show that he has been evicted by force, fraud, artifice, or any clandestine means, he is entitled to be restored to possession at all events, even though the other party may offer, and may be able to prove an unquestionably valid title in himself; and, 2. That where the plaintiff claims the possession of a large lot or tract of land included within the boundaries of his deed, by virtue of his having entered on and actually occupied a portion, in such case, he cannot recover for an intrusion on any portion not so actually occupied, unless it appears that he claims under a *just title* and in good faith, without which requisites he could never have *acquired* possession beyond the lines of his *actual* occupancy. In such case, the nature of the controversy changes from a question of mere possession, to a question as to the *right* of possessing; and this right can be established only through the medium of a *just title*.

I have referred to the case of *Meeker* v. *Williamson*, (4 *Martin*, *Rep.* 625.) It was held in that case, that, although ti-

Suñol *v*. Hepburn.

tle could not be tried in a possessory action, yet if the plaintiff puts at issue his *right* of possessing, and alleges ownership and exhibits his title, the defendant may dispute it, and retain possession until the plaintiff makes it good. Although the facts of that case differ, in some respects, from those developed in the present one, yet the principle on which the former was decided appears to be equally the principle on which the latter must depend.

It was insisted in *Meeker* v. *Williamson*, that the plaintiffs had a right to be restored to their possession, independently of any inquiry into their title, as in the case before us it is claimed that the validity of the plaintiffs' title cannot be questioned. In the former, the plaintiffs adduced no other evidence of their title than a bill of sale to them, as in the latter, the plaintiffs have adduced no evidence of their possession of this particular lot, prior to the entry of the defendant, other than their title. There, the court say, it is impossible to pronounce on the question of possession, without examining whether the bill of sale be such as the plaintiffs could possess under ; so here, I see not how we can determine in respect to the plaintiffs' possession of this particular lot, without ascertaining whether their title be such as could give them the *right* of possessing. In that case the court say : " In mere actions *recuperandæ possessionis*, the fact of " possession alone is at issue. The plaintiff, proving that he was " in possession, and ousted by violence, fraud, or artifice, becomes " entitled to recover possession at once ; the other party not being " even permitted to say that the plaintiff has no title to the thing. " But where the plaintiff puts at issue his *right* of possessing, as " where he alleges that he is the owner, and presents his title, as " the evidence of his possession, the *single fact* of possessing is no " longer the *only question*. The defendant is then allowed to dis- " pute the validity of that title, and is maintained in the actual " enjoyment of the premises, if the plaintiff fails to make his " title good." In support of these positions, two Spanish writers of acknowledged eminence and ability are cited ; *Greg. Lopez on Part*. 3, 2, 7 ; and *Gomez in leg. Tauri*, 45 *n*. 118.

Let us apply that doctrine to this case. The action is confess-

edly one *recuperandæ possessionis.* The plaintiffs, not having had the real and actual possession of the premises, could adduce no proof of possession, other than through the medium of their title. Their right of possessing this identical lot was at issue; they have alleged their ownership, and have presented their title as the evidence of their possession; the *simple fact* of possessing is, therefore, in the language of the court in *Meeker* v. *Williamson,* no longer the only question, and the defendant is allowed to dispute the validity of their title, and retain possession, if they fail to show a title under which they could possess.

This appears to be not only law, but reasonable and founded in justice. Were it not to prevail, then it would be necessary to hold, not only that the defendant could not avail himself of the imperfection or nullity of his adversary's title, when necessarily adduced as the only means by which the latter can make out his possession, but also that, according to the authorities hereinbefore cited, he could not be permitted to allege, or set up, or sustain his defense upon a perfect and indisputable title on his own part. This latter contingency, certainly under American, and doubtless under Mexican law also, can occur only where the defendant has evicted the plaintiff from actual possession, through force, fraud, or artifice; in which event, as we have seen, the plaintiff is entitled to be restored to possession irrespective of title; for, in the language of Mexican writers, public tranquillity requires, that no one, of his own authority and with violence, should be allowed to deprive another of that which he possesses. (*Escriche, Dic. de Leg. Art. " Despojo."*)

The point, then, which remains to be considered is as to the effect of the plaintiffs' title. And, first, let us ascertain what is understood, in Mexican law, by the terms *just title,* and holding in *good faith.* It was stated by the counsel for the appellants that there could be no possession, which the law would recognize as such, either natural or civil, either in fact or by the will, unless it was taken and held in good faith and by virtue of a *just title.* I think, the counsel carried the doctrine too far. The Spanish law recognizes a possession in bad faith and without

Suñol *v.* Hepburn.

*just title.* (*Escriche, Dic. de Leg. Art.* " *Poseedor de mala fé.*")
However this may be, the necessity of a *just title* is, in the pre-
sent case, admitted by counsel, as well as supported by autho-
rity. A possessor in good faith, is he, who, by a *just title*,
such as sale, gift, or legacy, has acquired a thing from one
whom he believed to be the owner, or to have the right to sell
it ; (*Escriche, Dic. de Leg. Art.* " *Poseedor de buena fé ;* 1
*Feb. Tapia,* 232 ;) and believing, at the same time, that he who
sold it had the power or faculty of selling. (*Escriche,* as last
cited.) The possessor in bad faith, is he, who has under his
control a thing which belongs to another, with the intention of
appropriating it to himself, without a title which is translative
of dominion, and he who holds a thing by virtue of a regular
title, (*titulo legitimo,*) but derived from a person who he knew
had not the power to sell it. (*Escriche, Dic. de Leg. Art.* "*Po-
seedor de mala fé.*") And one of the instances put of a posses-
sion in bad faith, is where one has acquired a thing in *contra-
vention of the laws.* (*Escriche,* as last cited.) The amount of
this is, that, if the title be regular and fair on its face, and the
purchaser had no reason to suppose that the vendor had not the
capacity to convey, the possession is under *just title* and in good
faith ; but, if the title be *defective on its face,* or the purchaser
knew that the vendor lacked the capacity to sell, the possession
is not in good faith, nor under *just title.* Or, to express the re-
sult in common law language, if the title be *colorable,* it may be
adduced to show possession of land, beyond the actual occupa-
tion, and to the extent of the boundaries mentioned in the deed.
If, therefore, in the case at bar, the title of the plaintiffs be re-
gular on its face, and they could, in contemplation of law, have
believed that the Indian Roberto had power to sell, then they
might, probably, make use of their title to extend their posses-
sions so as to make it co-extensive with the limits laid down in
their deed.

The question, then, is, whether their title be of this descrip-
tion. I am convinced that it is not. I am convinced that Ro-
berto had not the power to convey in the manner he did ; that
the title of the plaintiffs is defective and void on its face ; and

that they are chargeable, in law, with knowledge of both of these facts. If I am correct in these positions, there can be no pretence that they claim under *just title*, or can be considered as possessors in good faith.

I shall now proceed to consider these positions. And, first, as to the title. An essential element in the validity of a contract, whether in Mexican or American law, is a capacity to contract—a capacity in the grantor, to convey—and a capacity in the grantee, to receive. In some instances, as in the case of minors, there may be a qualified capacity to contract, which, when exercised, may, by subsequent acts, be brought to attain the effect of a full capacity. But in Roberto there was lacking, in every respect, the capacity to transfer the land, which he held as a gift from the government. The very instrument under which he acquired his rights, the grant from the governor of California, declares, in express terms, that he shall not have the power to alienate or mortgage the land, or impose upon it any charge or incumbrance whatsoever.

It cannot be seriously doubted, that any independent government may, in disposing of the national domain, annex to the estate and right conceded, such conditions and restrictions, as, in its own sovereign pleasure, it sees fit. The rule, that restraints upon alienation are contrary to the policy of the law, and therefore void, may be applicable to a conveyance from one individual to another, but can have no application to a grant from the sovereignty of a nation, or from an officer to whom the exercise of this attribute of sovereign power has been entrusted. Not only was it not opposed to Mexican law, for the governor of California in the discharge of his legitimate duties in distributing the public lands, to impose on an *emancipated* Indian restrictions against alienation, but it was in strict conformity with the positive provisions of Mexican legislation.

Mr. Halleck, in his report to General Riley concerning the regulations which controlled the grants or sales of land in California, says, " The emancipated Indians were to assist in the " cultivation of the common lands of the new *pueblos*, but were " prohibited from selling any of the lots or stock assigned to

Suñol *v.* Hepburn.

" them.   All contracts with them were declared void.   If they
" died without heirs, their property reverted to the nation."
And he adds, that the regulations, of which this is one, were con-
firmed as late as the year 1834.   According to the same report,
the secularization of the *Missions* of California was first pro-
jected by the governor and territorial Deputation of California,
for the purpose, and under the pretence, real or ostensible, of
ameliorating the condition of the native population.

The object of the restriction in the grant to Roberto, and of
the law to which Mr. Halleck refers, is entirely obvious.   They
both had, for their beneficent purpose, the interposition of an
insuperable barrier against all attempts on the part of the white
race to strip the natives of the property which they might ac-
cumulate by their own industry, or which they might receive
from the bounty of the government.   Such provisions were no
less wise in Mexico, and no less necessary in California, than
they have been found, from experience in the United States, to
be imperative, in order to prevent ignorance and thoughtless-
ness from being led into folly by superior knowledge and pru-
dence and sagacity.   And this was no new and late tone given
by Mexican legislators to national policy.   Whatever may have
been the practice of the European settlers of the Spanish domin-
ions in America, the spirit of the Spanish laws, when viewed
in the light of the ages in which they were enacted, always en-
deavored, though often with but little success, to cherish and
protect the native inhabitants against the rapacity of their inva-
ders.

By a decree of Philip II, made on the 24th day of March
1571, it was ordered, that when Indians wished to sell their
property, whether personal or real estate, it was to be sold at
auction, in the presence of the justice, after the expiration of
thirty days in the case of real estate, and nine days in the case
of personal property ; and that any sale, which had not these
requisites, should be of no validity or effect ; (*de ningun valor
ni efecto ;*) but that the justice might, if it appeared proper to
him, abridge this period in respect to moveables.   (*Ley* 27, *tit.*
6, *lib.* 1, *de la Rec. de Indias.*)

By *law* 18, *tit.* 12, *lib.* 4 *of the Recopilacion de Indias*, it was ordered, that the sale and distribution of lands to the Indians should be made in such a manner, that there should be appropriated to them a surplus over and above what they might, in strictness, lay claim to; and that the lands, upon which they should, by their personal industry, have made improvements, whereby the fertility of them was increased, should, in the first place, be set apart for them, and that, in no event, should they have the power to sell or alienate them, (*por ningun caso se les pueden vender ni enagenar.*)

*Laws* 16, 17, 18 *and* 19, *of title* 12, *lib.* 4, of the same code also prohibited the sale of lands of the Indians without the citation of the *fiscal* of the *audiencia*, and provided rules and regulations to protect the Indians in the possession of their lands, and to secure them in the free use and enjoyment of them.

In order to enforce the more exact observance of the laws last cited, and by virtue thereof, the royal *audiencia* of Mexico, on the 23d day of February 1781, adopted an ordinance, entitled *Instructions concerning sales and alienations of lands by Indians*, which sets forth, in full, the policy of the Spanish laws in prohibiting such sales. This speaks of the general abuse with which the Indians persisted in the hurtful practice of alienating their lands, building-lots, and houses, as well those of their own individual acquisition, as those of community, whereby they subjected themselves to inexpressible losses, (*imponderables perjuicios,*) until, at length, the most improvident among them found themselves destitute of habitations wherein to live, and were left without even the shelter of cabins sufficient for the preservation of human life. Reference is therein made to the great prejudice which the Indians suffered, through loans, pledges, leases, and sales, which they were in the habit of making, either voluntarily or under the constraint of want or compulsion, not only from one to another, but also to strangers, Spaniards, Mestizos, and other castes, without regard to the provisions of the laws in the *Recopilacion de Indias*, which declared such sales to be, not only unlawful, but prohibited, unless made with a previous license and with the formali-

Suñol *v.* Hepburn.

ties required by law. It declares that this practice, increasing from day to day, would, if longer tolerated, induce the fear that the Indians would finally arrive at that most unhappy condition, in which they would have neither habitations to dwell in, nor land to cultivate, nor means wherewith to procure a sustenance or pay the duties imposed on them, and would become inaccessible to the pious efforts of the government for their preservation and increase; but would, when finding themselves in a destitute condition, surrender themselves to idleness and a vagabond life, to which they were naturally prone, would abandon their families and separate themselves from their *pueblos*, become fugitives and vagrants, and thereby, to a great degree, deprive the royal treasury of the tribute which they were required to pay. These are some of the many motives and inducements recited in that ordinance for prohibiting Indians from alienating or incumbering their lands. It then declares that, in no case and under no pretext, should there be executed any sales, mortgages, leases, or other species of alienation of lands by Indians, not only of such lands as were set apart for common use, but also of such as had been, or which should be, acquired as private property by inheritance, gift, or other means of acquisition, unless such sale, lease, or other species of alienation, should have first received the license of the superior government, the general court of the natives, or the royal *audiencia*, upon proof of the necessity and utility thereof, with a previous hearing of the *fiscal*, and after a full compliance with all the requirements of law; and all justices and *escribanos* were prohibited from sanctioning any instrument of sale or lease, without the aforesaid licenses, under the penalty of five hundred dollars and loss of office, and the nullity of such instruments, (*la nulidad de los que así otorgaren*,) with the additional penalty that the vendors, lessors, and mortgagors, and the purchasers, lessees, and mortgagees, should be condemned to lose the lands, which were, thereupon, required to be given to other necessitous persons, who would observe the laws in relation to their preservation and use. (*Ordenanzas de Tierras y Aguas,* 94 *to* 98.)

So, also, by the royal ordinance for the establishment and instruction of the *Intendants of Army and Province* in New Spain, which received the sanction of the Spanish monarch Charles III in the year 1781, it was ordered, that crown lands should be distributed to married Indians, who were not, either in their own right or in the right of their wives, the owners of any, with a prohibition from aliening the same, in order that their heirs of both sexes might succeed thereto; "for," says the ordinance, "my royal pleasure is, that all such natives may have a "competent quantity of real property." (*Sec.* 61, *of Real Ordenanza de Intendentes.*)

These are some of the provisions of Spanish and Mexican law, touching the disability of Indians to transfer their lands. All of them manifest the great anxiety which the rulers of Mexico have felt, to collect the natives together in communities and subject them to municipal regulations, to secure to them the ability to pay the tribute imposed upon them for the supply of the national treasury, to induce them to forget their ancient religious rites and embrace the catholic faith, to reform their idle and roving propensities and make them industrious and useful subjects. (*See Ley* 1, *tit.* 3, *lib.* 6, *Rec. de Indias.*) The legislation on this subject was not limited solely to considerations of benefit to individuals. Its whole tenor abundantly proves, that its main purpose was the advancement of great measures of national policy in respect both to temporal and spiritual affairs—that it was a series of continued efforts to obviate the hurtful consequences resulting to society from having in its midst a population destitute of habitations and the means of subsistence, and consequently vicious, vagrant, and easily seduced into the commission of crime.

It would seem to be sufficient to establish the position, that the conveyance from Roberto to Suñol did not give even a color of title, that the attempted transfer was not only in palpable violation of the plain terms of the grant to Roberto, but was expressly prohibited by positive law, and in contravention of the entire spirit of Spanish and Mexican legislation. I cannot doubt, that the Mexican courts would have held the conveyance

Suñol *v.* Hepburn.

to be void, not only when directly attacked by the government or by the beneficiary himself or his heirs, but when coming up collaterally, as in this case. The law, for wise municipal purposes, has pronounced it to be of no validity or effect, and courts ought not to attempt to overturn the ascertained policy of the legislative power.

But the counsel for the appellants insists, that, by the decrees of 1812 and 1813, (9 *Col. of Decrees* 54, 57, 107,) and by the provisions of the constitution of 1836, (*Arts.* 1, 2, 7,) and of the constitution of 1843, (*tit.* 2, *art.* 7,) the restrictions on alienation by Indians were removed.

The decrees cited provide for the distribution to Indians of lands in the vicinity of the *Pueblos,* and lands held in common, with prohibitions to entail the same or convey them in *mortmain;* and the conclusion is deduced from the fact of such limited prohibition, that the beneficiaries had, in all other respects, the unqualified power of alienation. I cannot come to the same conclusion. I think these decrees neither do, nor were intended to, supersede the laws then in force. The law, as it then stood, did not absolutely forbid the transfer of lands held by Indians; but it required, as an essential requisite to the validity of a conveyance, that it should be made under the supervision, and receive the approbation, of the proper officer. These decrees, however, take away the power of alienation, even in this manner, when the transfer is by way of entail, or in *mortmain.* The anterior law is not expressly repealed by the decrees cited, and, at the same time, not being inconsistent with, nor repugnant to them, is not affected by implication.

The constitutions referred to, it is said, by conferring upon Indians the character of Mexican citizens, thereby removed all restraints on the alienation of lands by them. But this argument proves too much. Infants, idiots, lunatics, spendthrifts, and married women, are also Mexican citizens; yet it can scarcely be claimed that those constitutional provisions were intended to remove all disabilities, under which they are placed by law, and enable them to contract and alienate their property without the intervention of tutor or curator, committee or guar-

dian. So with Indians. Though elevated to the condition of Mexican citizens, they must still contract, and convey property, in the mode prescribed for them by law.

It is further contended that, by virtue of the Plan of Iguala, and the circular of January 11th, 1821, which declared that all the inhabitants of Mexico were equal in rights, without distinction of Europeans, Africans or Indians, the disabilities of the latter class to transfer their lands without control were removed.

The same objection to this argument arises, which has been noticed in respect to that founded on the constitutions referred to. It proves too much. Besides, it is laid down in the *Febrero Mejicano,* (*tom.* 1, p. 97,) in speaking of the Plan of Iguala, that all those laws, which establish different regulations, according to the diversity of races, still remain in force, when they concede some rational and substantial favor, though not, when, without reason, they subject any class to a distinction ridiculous and abhorrent. And we have seen, that the object of the disability under consideration, was not to create an invidious distinction or impose a useless burden, but, in part at least, to favor the native inhabitants by shielding them from the impositions of the superior races.

By the above reasoning I am led to the conclusion that the title of the plaintiffs is null and void.

The next question is whether it was void on its face. The approbation and consent of the government being necessary to the transfer by Roberto, and his conveyance having been made without such approbation or consent, the title, therefore, on its face, is lacking in a substantial point, as much as if, in any other particular, it were defective in the essential requirements of law.

Are the plaintiffs chargeable with knowledge that they took nothing under their deeds? It is a principle of Spanish and Mexican jurisprudence, equally with the English and American, that every citizen is presumed to know the law, and, with some exceptions not affecting this case, ignorance of it excuses no one. (*Escriche, Dic. de Leg. Art.* " *Ignorancia ;*" 1 *Feb. Mej.* 13.) The law, then, says that the plaintiffs, when they received

their title, knew that Roberto had not the capacity to convey; that the title to them was void, on its face, for the want of an indispensable requisite. They cannot, therefore, according to the Mexican authorities hereinbefore cited, insist that they claim in good faith.

I come, now, to consider the effect of a claim set up under a title thus defective.

In Spanish law, nullity is divided into absolute and relative. The former is that which arises from a law, whether civil or criminal, the principal motive for which is the public interest; and the latter is that which affects only certain individuals. Nullity is not to be confounded with *rescision.* Nullity takes place, when the act is affected with a radical vice, which prevents it from producing any effect; as where an act is in contravention of the laws or of good morals, or where it has been executed by a person, who cannot be supposed to have any will, as a child under the age of seven years or a madman, (*un niño ó demente.*) *Rescision* is where an act, valid in appearance, nevertheless conceals a defect, which may make it null, if demanded by any of the parties; as for example, mistake, force, fraud, deceit, want of sufficient age, &c. Nullity relates generally to public order, and cannot, therefore, be made good, either by ratification or prescription; so that the tribunals ought, for this reason alone, to decide that the null act can have no effect, without stopping to inquire whether the parties to it have, or have not, received any injury. *Rescision,* on the contrary, may be made good by ratification or by the silence of the parties; and neither of the parties can demand it, unless he can prove that he has received some prejudice or sustained some damage by the act. (*Escriche, Dic. de Leg. Art. " Nulidad."*)

In *Spencer* v. *Grimball,* (6 *Martin's New Series,* 362,) the court, treating of the Spanish law on this subject, say : " Some " of the writers on our law, of the very highest authority, are " of opinion that it is only such nullities as grow out of prohi- " bitions, *having for their first and principal object, reasons of* " *public utility, that strangers can set up in their defense ;* and

" that, whenever the nullity is pronounced by the law more in " relation to the individual than the public, the party intended " to be protected, can only claim the benefit of it. Others, of " equal celebrity, reject the distinction, and think, that, when- " ever the contract claimed under is declared null for want of " certain formalities, no person can claim under it."

The nullity of the conveyance from Roberto results as we have seen, from its being in violation of legal prohibitions, having for their first and principal object public order and public utility, and, therefore, in the language of Escriche above cited, cannot be made good either by ratification or prescription, and may, as implied by the language of the court in *Spencer* v. *Grimball*, be set up by a stranger in his defense.

I am aware that the case last cited may be claimed to have decided the contrary of the conclusion to which I have arrived. Were that, indeed, so, I might perhaps think that we ought not to determine a point in opposition to the authority of that distinguished tribunal. The facts of that case, however, bear but a remote analogy to the facts of the case before us. The sale there was by a tribe of Indians—here, by an individual. The question there was, whether the Beloxi tribe of Indians had parted with the title to their lands. But it appeared that the sale was not, as in the case at bar, a private transaction, but a public act, passed before the commandant of Rapides, and approved by the governor of Louisiana. The Spanish law was thus substantially complied with. The only point decided by that case is, that it was not necessary that the sale should be at public auction, and in that conclusion I entirely concur.

I may be allowed to suggest, with the highest respect for the eminent legal ability of the judge who delivered the opinion of the court in *Spencer* v. *Grimball*, that the reasoning of that case, if extended beyond the precise facts to which it is there applied, can scarcely bear the test of examination. He likens the incapacity of Indians to the temporary disability to which minors are subject, and deduces the conclusion, that, because a sale from a minor is only voidable, therefore a sale from Indians is also only voidable. But we have seen from the author-

Suñol *v.* Hepburn.

ity of *Escriche*, that whilst a contract with a person *de menor edad* is only voidable and subject merely to the rescission of the party, a contract with a lunatic on an infant under the age of seven years (*un niño*) is affected with that radical vice which prevents it from having any effect. A contract with an Indian partakes rather of the nature of a contract with *un niño*, or *un demente*, than of a contract with a person, who, though not having attained full age, has nevertheless passed the bounds of childhood. Again, it seems to be conceded in that case, that nullities growing out of prohibitions, which are founded upon reasons of public utility, may be taken advantage of by strangers in their defense ; and such, we have seen, were the reasons for the prohibitions under consideration.

Nor do I deem it any answer to the view of the case I have taken, to say that the restraint on alienation in the grant from Micheltoreno to Roberto is a condition, for the breach of which only the government can interfere. It may be true as a general proposition, applicable between individuals, or even, perhaps, where the government is a party, when neither positive statute nor the general policy of the law has been contravened, that the breach of a condition can be taken advantage of only by the person who imposed it, or by one who is a privy either in contract or estate. But here is something more than a condition. It is an absolute prohibition—a prohibition, too, which is in perfect harmony with both the letter and spirit of Spanish and Mexican legislation for centuries. The policy of the law, for wise purposes, will not permit the white race to trade or traffic with the Indians in the lands granted to them by the government. That law and that policy, in addition to the plain terms of the original grant, have been disregarded by the plaintiffs, and the defendant, a stranger, is consequently permitted to avail himself of the nullity of their title.

The policy referred to is not peculiar to Spain or to Mexico, but is adopted and adhered to in the United States. There, Indians are permitted to sell their lands under the superintendence of an agent of the government, whilst a private sale is void, and

ineffectual for any purpose, even to support a colorable claim of title.

A case strongly analogous to the one at bar, has been decided by the supreme court of the state of New York. (*Jackson ex dem. Gilbert* v. *Wood*, 7 *J. R.* 290.) It there appeared that a patent for a lot of land had been issued to an Oneida Indian, " to hold unto him and his heirs and assigns forever." The patentee died leaving two sons, his heirs, who sold and conveyed the land to A. It was held that the sale and conveyance were void, they not having received the consent of the legislature, or the approval of the surveyor-general, as required by law. Kent, Ch. J., delivering the opinion of the court, says : " The various " regulations in the act of 1801, all show the sense of the legis- " lature, that an Indian, in his individual capacity, is, in a great " degree, *inops consilii*, and unfit to make contracts, unless with " the consent, and under the protection, of a civil magistrate. " The law not only protects Indians from any suit upon their " contracts, but it declares specially, that all alienations of land " by the Brothertown and New Stockbridge Indians, are void. " These are just and humane guards against the imposition and " frauds, which that unfortunate people have not the power to " withstand. The same provisions prevail in the Spanish co- " lonies. None of the Indians within the Spanish dominions " can dispose of their real property, without the intervention of " a magistrate." Again he says, (*p.* 297,) " these statutes " ought to be construed liberally. The principles of public po- " licy, a sense of justice and humanity, the honor of the state, " and the conclusions of law, require us to consider such con- " tracts as made with persons unfit to contract without the ad- " vice of disinterested counsel."

If any reasons were needed in addition to those above advanced, to maintain the justice and wisdom of the policy of the law, they might be gathered from this very case. Roberto the Indian conveyed, in payment of a precedent debt of five hundred dollars, an estate which the proof shows to be worth one hundred thousand dollars ; and though the value of the land is, doubtless, greatly enhanced since the conveyance, there can, I

Suñol v. Hepburn.

think, be but little question, that, at the time of the sale, this tract of land, as fertile probably as any in the state, was worth more than twenty-three cents an acre.

The sole question remaining is, as to what effect should be given to the stipulation, which I noticed in the outset. In all cases coming up from courts of First Instance, I am disposed, owing to the want of form and regularity in their proceedings, to look on an application for a new trial with great favor; and if, in this case, I supposed that the plaintiffs could make out an actual possession without resorting to their title, and an eviction by the defendant of the character required, I should feel disposed to waive the strict construction, which, if the stipulation had been given under the present system of practice, ought to be applied to it. But the cause seems to have been thoroughly tried, and the evidence fully returned; and I do not see how it is possible for the plaintiffs to make out a possession without resorting to their title, and the moment they invoke the aid of that, they show that they could never have acquired possession beyond the metes and bounds of their actual occupation. A new trial would, consequently, be but an useless expense; I think it should be refused, and the judgment be affirmed.

Ordered accordingly.

HASTINGS, Ch. J. (dissenting.) The plaintiffs sued to recover a tract of land, alleging that for more than two years they had been in the peaceable, public, and uninterrupted possession of the land, as owners, and that, shortly before the commencement of their suit, the defendants forcibly entered upon and detained it, and that, when the plaintiffs had erected a building upon the land, the defendants came with force and drove away the plaintiffs' workmen, and destroyed their building. The plaintiffs seek to be restored to the possession, and to recover damages. The defendants deny all the allegations of the petition, and claim back one hundred and sixty acres of the land under the pre-emption laws of the United States. The defendant Hepburn justifies the destruction of the plaintiffs' building on the

ground that it was erected within the furrow which marked the lines of his settlement, and was a nuisance. The other defendants justify as his agents and servants. He also claims damages in re-convention from the plaintiffs, on the ground that they have erected another building within his enclosure. The record contains all the evidence given on the trial. The plaintiffs insist that the verdict is contrary to the law and evidence. The law of evidence in actions of ejectment at common law has been appealed to on the argument of this cause and an effort made to place the plaintiffs in the position of parties setting up title, and seeking to acquire possession, but we should look to the remedies existing at the time when the action was brought under the system of jurisprudence then in force. The Spanish law as modified by statute, and not repugnant to the Republican institutions of Mexico, was the law of California up to the time of the acquisition of the country by the United States. (1 *Alvarez*, 16—5 *Col. de Dec.* 1—1 *Febrero Mexicano*, 27.) And that acquisition effected no change in the law regulating the rights or relations of individuals. (*Hal. Dig.* 200—411 *Vattel*—3 *Part.* 199, 200, 201—1 *Pet. R.* 57, 542, and other cases cited in 6*th*, 7*th*, 9*th*, 10*th*, 12*th*, *Pet. Rep.*)

The different kinds of possession for the recovery of which possessory actions are sustained in the Spanish and civil law, the two interdicts summary and plenary instituted for the recovery of such possession, are fully examined in my dissenting opinion in the case of *Woodworth* v. *Fulton et al.*, to which case reference is now made, for a better understanding of the rights and remedies of a party despoiled of possession of immoveable property. This action is purely a possessory one, the plenary interdict. No title in the plaintiffs is alleged, but a possession under a claim of title in good faith for more than a year and a day.

To maintain their right to recover it is only necessary in this action for the plaintiffs to show their own possession for that length of time, and the entry of the defendants. The question of title cannot be raised. In Louisiana, whose system of law is derived from the same source as that which prevailed here, pos-

Suñol *v.* Hepburn.

session for a year gives presumptive title; upon proof of such possession in a possessory action brought within a year, a party can recover the possession even against the true owner, who would not be permitted to set up his own title as a defense, but would be driven to his petitory action. (*Code of Pr.* 46, 47, 49, 53.) The distinction between petitory and possessory actions is so well marked, that these actions cannot be joined unless by consent. (*C. P. Art.* 55.) That in the latter class of actions the defendant cannot plead title has been repeatedly decided in the Louisiana courts. (7 *N. S.* 486; 7 *L. R.* 415; 10 *L. R.* 140.) Nor can the jury examine as to title. (6 *L. R.* 559.) Nor is either party allowed to introduce evidence of title. (*C. P. Art.* 53; *C. C.* 3418; 7 *L. R.* 415.) Though an exception to this last rule would probably take place when the extent of possession is disputed. (6 *L. R.* 56.) The Spanish law equally recognizes this distinction between suits claiming possession and those claiming property. (3 *Part. tit.* 2, *C.* 27; *Dic. de Esc.* "*Juicio petitorio;*" 1 *Febrero Tapia,* 227.) It is adopted by special enactment in Mexico. (8 *Col. de Dec.* 227.) It will be seen by reference to these authorities, that, when an action is brought to recover the possession, the right to the possession must be determined before the right to the property. The same terms are employed in the Spanish law as in that of Louisiana to distinguish these actions. (*Dic. de Esc.* "*Juicio petitorio y posesorio.*") As to the forms of proceedings in these actions, see same work. ("*Juicio pet.,*" "*Interdicto,*" "*Despojo.*") To entitle a person to recover in either of these forms of action, possession for a year and a day is sufficient. (*Same work above cited; and* 1 *Febrero Tapia,* 229; 1 *Feb. Nov.* 353–355.) The only difference observable between the Spanish law and that of Louisiana, is that, in the latter, a defendant is not permitted to offer evidence of title, while in the former, as appears from an authority quoted, he may defend himself on the ground of title, if ready to establish it immediately by satisfactory proof. (3 *Part. tit.* 2, *c.* 27.) It is said, however, that this authority is not sustained by any other.

But the defendants set up title. They claim a right by virtue

Suñol v. Hepburn.

of the pre-emption laws, to enter upon the premises as a part of the public domain. Such a claim can hardly be urged seriously, as it is well known that no pre-emption law was, or is, in force in this country.

The land in controversy, a half league, was granted in 1844, by the government to Roberto, an *emancipated* Indian, and was subsequently conveyed by him to Suñol, one of the plaintiffs, who sold an undivided interest in it to the other plaintiffs. The act of emancipation of Roberto, the grant to him, his conveyance to Suñol, the confirmation of that conveyance by his heirs, the order of the Alcalde putting Suñol in *judicial* possession, and the survey of the land were given in evidence to show that these parties claimed as owners under title and in good faith, and to show the extent of their possession. It appears from the testimony that there was an actual occupation of portions of the land by Roberto or those who claim under him from the time of the grant, and even before it, down to the time when this suit was commenced, and a constant exercise of acts of ownership over the whole tract until the defendants entered. The defendants entered that portion of the land which had, prior to their entry, been surveyed into a town, and after their entry the survey stakes were visible. On the 14th of Dec. 1849, the day prior to Suñol's conveyance to Naglee and Sansevaine, Naglee, in company with Whiting, examined the premises. Ledbetter's survey was completed on that day. Hepburn's house was not then on the land, but it seems he occupied a tent on the *alameda*, a few yards from the line and limits of the town survey and tract of land claimed by the plaintiffs. The defendants, therefore, must have known and had notice of plaintiffs' claim to possession at least, and this was acknowledged to one of defendants' witnesses.

Does this evidence prove a sufficient possession? or is it requisite that the whole tract should have been inclosed, or cultivated? In Louisiana an actual occupation is not required. Possession of part with a claim of title to the whole, or where there has been a natural possession not abandoned, a civil possession only is sufficient. (*C. P.* 49; *C. C.* 3394, 3389–90–91,

Suñol *v.* Hepburn.

3417; *Bernard* v. *Shaw*, 9 *M. R.* 79; *Mayfield* v. *Morris*, 10
*L. R.* 442, *and* 15 *L. R.* 561; 19 *L. R.* 253.)    Under the
Spanish law, too, a mere civil possession is sufficient, provided
the possessor hold in good faith and by virtue of a title transla-
tive of property.  And it seems, without these qualities, one
who holds property holds it *precariously.*  He is not a posses-
sor.  His occupancy will not grow into a right of possession in
any length of time short of that required to prescribe for the
property in the land. (*Esc. Dic.* " *Posesion,*" 543; *same* 534;
3 *Part. tit.* 30, *c.* 1, 6; 1 *Febrero Tapia,* 229, 231, 230; 7*th
Febrero Tapia,* 32, *sec.* 11; *Ordenanzas de Tierras y Aguas,*
12, 13, 17, 18.)  In the whole Spanish law there is nothing as
yet submitted to this court that will justify the opinion that
possession must be an actual occupancy or it cannot be asserted.
The term actual possession is not unknown to that law, but it
has a peculiar and technical meaning. (*Dic. de Esc.* " *Posesion
Actual, Artificiosa.*")

But from the testimony it is evident that the plaintiffs had
the actual possession, at the time of the entry of the defendants.
The part inclosed by defendants' furrow was in their actual oc-
cupancy, having been surveyed into a town.  Stakes and maps
existed indicating especially to the defendants, whose tent was
but a few feet from the line, the possession of the plaintiffs.  As
to these defendants, then, without proof of any other possession
or acts of ownership, at common law, the plaintiffs could re-
cover in a summary action.  It was not necessary that the prem-
ises should be actually inclosed with a fence; any improvements
or monuments which show the land to have been occupied by
another, and there being no evidence of an abandonment, are
sufficient.  (See cases cited in *Woodworth* v. *Fulton,* decided at
this term; *Ellicott & Meredith* v. *Pearl,* 10 *Pet. Rep.* 441;
*Ewing* v. *Burnet,* 11 *Pet. Rep.* 52.)

The fact of possession in the plaintiffs being established,
either natural or civil, to a part of the land granted to Roberto,
it becomes perhaps the most difficult question in this case to
ascertain the extent of such possession.  Both the Spanish and
common law writers agree that he who is in possession of a

part of a tract of land under claim of title in good faith, with specified metes and bounds, possesses to the extent thereof. (See authorities referred to in *Woodworth* v. *Fulton.*)

The plaintiffs have a deed executed in the usual form to impart title, (*Apt to transfer property,*) describing the premises by certain monuments, courses, and distances, not very distinctly defined however, nor clearly understood, but perhaps sufficient with the aid of oral proof.

But it is said the deed from Roberto to Suñol is void, as an Indian could not alienate his property but in the manner prescribed by law ; that Suñol was bound to know the law, and to know that the conveyance of Roberto was void, and transferred no title. Suñol not only purchased of Roberto, but also of his heirs, after his decease. The other plaintiffs purchased of Suñol. If these conveyances do not furnish colorable title which would be sufficient in adverse possession or prescription, then the decisions of the courts in the case of *Jackson* v. *Newton*, (18 *Johnson's Rep.* 355 ;) *Northrop* v. *Wright*, (7 *Hill, Rep.* 468–9 ;) *La Frambois* v. *Jackson* (8 *Cowen,* 589 ;) and the doctrines of the Spanish law writers referred to in *Woodworth* v. *Fulton,* and the uniform decisions of the courts of Louisiana, are not law.

The idea that an Indian could not convey land is derived from the various laws and royal ordinances relating to the government of the Indians, which were promulgated at different periods between the years 1551 and 1787. (*Ord. de Tierras y Aguas,* 97, 112; 2 *White's Recop.* 703.) One of these (24 *May,* 1571) prescribes the formalities which shall be observed by the Indians in making sales of their property, and declares void all sales made without those formalities. These regulations were intended for the protection of those Indians who formed separate communities, and lived in the *Pueblos,* as the mere occupants of the lands from which they had never been ejected, and the title to which was in the crown. That this is the object of those laws is apparent from their perusal.

Admitting that a conveyance by an Indian was prohibited by the law, it was for the benefit of the Indian that the prohi-

Suñol v. Hepburn.

bition was made. Though his deed might be void as to himself and his heirs, it was good as to all others. There are two cases in the decisions of the supreme court of Louisiana to this effect. In the case of *Martin* v. *Johnson et al.*, (5 *M. R.* 655,) the defendants claimed under a deed from Indians. It was objected that the deed did not transfer the title, as such alienations were prohibited by law, unless the sale was made at auction, which was not the case here. The court held, that if the objection was well founded "the Indians would not have been "legally divested of their title, and could, perhaps, take ad- "vantage of it against the defendants; but until then the de- "fendants held in their right and cannot be disturbed by "others." In *Spencer's heirs* v. *Grimball*, (6 *N. S.* 355,) where the plaintiffs claimed under such a deed, the court said, "If a "sale by the Indians was followed by payment of the price "and delivery of the property, no person can take advan- "tage of an informality in the mode of making it but the In- "dians." In this case the court makes a distinction between a nullity which is absolute, and one which is relative—founded upon the object of the law which prohibits an act and declares it void. Where the act is prohibited from motives of public policy, the nullity is absolute; when the intention is to give protection to individuals, it is relative. In the former, the act is absolutely void, in the other, it is voidable only, as a deed by a minor, which no one can avoid but the minor himself, and even he is bound by it after he arrives at his majority, if he do not dissent.

The Indians were considered as persons under legal disability, and their legal protectors stand in the light of guardians, and although of age, they enjoyed the rights of minors to avoid contracts or other disposition of their property, particularly real, made without the authority of the judiciary, or the intervention of their legal protectors. (2d *White's Recop.* 704.)

These laws then would not render absolutely void a deed from an Indian, but voidable only, as in the case of infants under guardians. The Indians were under a state of pupilage. But in this case the Indian, Roberto, as he is called, was, at the time of his sale to Suñol, under no such disability. He was an

*emancipated* Indian, having no legal protectors. Upon an examination of the decisions in the courts of Louisiana it appears that they are all made in cases where the lands in controversy were *Pueblo* lands, or those in the occupancy of an Indian tribe or community. It is believed that there is a manifest distinction between such cases and that of a grant by the government to an Indian as a settler or citizen.

It is argued with much plausible reasoning, the correctness of which cannot well be controverted, that the grantee, Roberto, was a Mexican citizen according to the terms of the constitution; that it was only as a Mexican citizen that such a grant could be made to him, it being expressly prohibited by the colonization law to all others than Mexican citizens; and that the grant was made by the competent authority, whose acts are to be presumed to be valid.

Upon the point that Roberto was under no disability, reference is made to 1 *Febrero Mexicano, p.* 96, *sec.* 48 : " In " the ancient laws other distinctions are made between men on " account of their races and colors, and of these the principal " was the one between Indians and Spaniards. So odious a " classification has not existed in the republic since it declared " itself sovereign and independent, and principally since the " Plan of Iguala declared all inhabitants to be equal in rights " without distinction between Europeans, Africans and Indians." The 12th article of the Plan of Iguala declares, " all the inha- " bitants of New Spain, without distinction between Europeans, " Africans or Indians, are citizens of this monarchy, with a " right to hold office according to their merit and virtues." (1 *Col. de Dec.* 4.) In the same work, (*p.* 257, *sec.* 1,) it is said, " Anciently the Indians also were reputed minors under the " age of five and twenty years, although they were above that " age ; but now it is expressly declared that, allowing them to " be equal to other citizens, they are no longer in a state of " minority ;" and this clause refers to a circular of 11th of January, 1821. The Indian, then, rests no longer under that state of pupilage in which the law formerly placed him.

It seems that the grant to Roberto contains conditions prohi-

Suñol v. Hepburn.

biting an alienation, and for this reason, it is said, the sale to Suñol was void. What right or authority had the governor to impose such an odious incumbrance on a grant? No authority has been shown, no statute or decree of the general government prescribing such to be the form of grants to *emancipated* Indians; and it is believed no law can be referred to which will authorize the introduction of such odious conditions in a grant. These conditions were and are absolutely void, interposed without authority of law, and the grant is to be construed as if no such obstacles had been inserted.

The Indian Roberto was a citizen of the Republic, enjoying all the rights and privileges of any other citizen of Mexico, and was eligible to office according to his merits and virtues. This is admitted. Yet it is said that a Mexican citizen, because he happens to be of Indian blood, or an *emancipated* Indian, shall not, and cannot, transfer his property in real estate, without permission, and under the direction of a judicial officer, as if he were an insane person, lunatic, or infant. It appears evident that to be a citizen, enjoying equal rights with other citizens of the Republic, the Indian must enjoy the right to alienate his property without restraint—the right to think and act for himself. It is matter of history that some of the wealthiest citizens of this state, at the present time, are either Indians of full or half blood. They are men of wealth, intelligence, and education, and yet by the *Plan of Iguala*, as well as by the principles of the Republican Institutions of Mexico, they have no superior social rights to the Indian Roberto, nor any higher legal privileges.

The policy of the Royal government of Spain, regulating the intercourse with the Indians, humane as it may have been, differed widely from the system of trade and intercourse with the Indian tribes adopted by the government of the United States. The United States have never elevated the Indian to an equality in rights and privileges with the white race; if so, trade and traffic in property, real and personal, would be free, and not positively *inhibited* by the National Legislature.

Entertaining these views, and governed by the law as I understand it, I believe the following conclusions to be correct:—

1st. If the *grantee Roberto* were under the disability sought to be established, the plaintiffs having purchased in good faith, have a *colorable* claim of title.

2d. That, if under such incapacity, no third party can take advantage of it; the sale could be avoided only by Roberto, his heirs, or the government.

3d. That all restraints upon Indians, in the alienation of their real property, appear to have been abolished.

4th. That the plaintiffs had, at the time of the entry of defendants, actual possession of a part of the premises conveyed, in the name of the whole.

5th. That such possession is good for the entire tract within the specified metes and bounds.

6th. That they can sustain their action to oust any intruder without title.

I think, therefore, the judgment of the court of First Instance should be reversed, and a new trial had. (*a*)

---

(*a*) After the decision of the above cause, another motion for a re-hearing was made, on which occasion the opinion of the court was delivered by

BENNETT, J. This cause has been twice argued; once by counsel for both parties, and again *ex parte*, on behalf of the plaintiffs. An application is now made for a re-hearing. No new arguments are advanced, and no additional authorities cited. Indeed, the plaintiffs state, in their petition for a re-hearing, that "no new views " are sought to be offered." The old views have been twice presented to the court, and twice considered by it, and as the court is satisfied that its former decision is in conformity both with law and justice, it sees no reason why that decision should be disturbed.

It is proper, however, to observe that our former judgment did not pretend to define the quantity of land of which the defendant was in possession. This could not well have been done under the pleadings. It barely decides that the plaintiffs showed no right to oust the defendant from any portion of the land claimed by the plaintiffs, the *actual possession* of which the defendant, Hepburn, had at the time the suit was brought.

Re-hearing denied.