**UNITED STATES v. ALGODONES LAND CO. et al.**

No. 344.

Circuit Court of Appeals, Tenth Circuit.

Sept. 11, 1931.

George A. H. Fraser, Sp. Asst. to Atty. Gen.

Manuel A. Sanchez, of Santa Fé, N. M. (C. R. Brice, of Santa Fé, N. M., on the brief), for appellees Alfredo Montoya and wife.

Thos. J. Mabry, of Albuquerque, N. M., for appellee Manuel G. de Baca.

Summers Burkhart, of Albuquerque, N. M., for all other appellees.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge.

The United States, as guardian of the Indians of the pueblo of San Felipe, appeals from a decree denying its prayer to quiet title to 22 tracts of land. Since the appeal was taken, the decision of this court in United States v. Wooten, 40 F.(2d) 882, has become final and requires an affirmance as to eight of the tracts.[1] This court's decision in Pueblo de Taos v. Gusdorf, 50 F.(2d) 721, has been handed down since the argument of this appeal and requires a reversal as to claim No. 12, Manuel C. de Baca, the evidence being undisputed that the land was sold for taxes during the period of adverse possession. The remaining claims may be grouped:

The Santa Rosa de Cubero Grant.

Alfredo Montoya and others defend their title to 1,402.35 acres embraced in the Santa Rosa de Cubero grant of 1815, on two grounds, both of which were sustained by the trial court: (1) That the pueblo of San Felipe never had title to this tract; and (2) that they acquired title by adverse possession

[1] Claims No. 82, Juan Archibeque y Aragon; Nos. 83 and 118, Elias Vigil; Nos. 90, 158 and 189, Jacobo Perea and Mrs. Beatriz G. Montoya; No. 196, Andres Gurule and Juan Lovato; No. 150, Frank Griego.

under section 4 of the Pueblo Lands Act of June 7, 1924 (43 Stat. 636 [25 USCA § 331 note]).

The question of whether the pueblo ever had title hinges upon the northern boundary of the grant made to the pueblo in 1689. The pueblo asserts that its northern boundary is the southern boundary of the grant to the pueblo of Santo Domingo. The claimants assert that the two boundaries were not coincident; that there lay between them a large tract, granted by Spain in 1815, and known as the Santa Rosa de Cubero grant. The pueblo claims that the Cubero grant of 1815 was void because it was superimposed upon the grant theretofore made to it.

The northern call of the San Felipe grant is "on the north the Bosque Grande [large woods] which is toward the east." This landmark is now incapable of identification. The south boundary of the Santo Domingo grant is the Loma Pelada, a bare bald hill. If it had been the intention that the two grants should adjoin, the natural thing to have done would have been either to have used a common landmark as the boundary of each, or, better still, for the later grant to have used as a call "the southern boundary of the lands heretofore granted to the Pueblo of Santo Domingo," or the converse. There is no common physical characteristic between a "large woods" and a "bare, bald hill"; that two dissimilar landmarks were used indicates that the boundaries were not coincident.

Strong support of the trial court's decree is found in ancient documents, the authenticity of which is not challenged. It appears that in 1815 the Spanish government was petitioned to grant to Fernandez and Quintana "the surplus of the two Pueblos of Santo Domingo and San Felipe, leaving them unharmed and without disturbing the boundaries of said Pueblos." The Spanish Governor referred the petition to the local Alcalde, with instructions to see that the grant, if made, should be "without prejudice to the measurements of the Pueblos of Santo Domingo and San Felipe, or other third person." The Alcalde measured the grants to both pueblos in the presence of the Governor and other Indians of San Felipe; he reported that the Indians gave their consent and that no opposition to the grant was offered by either pueblo. Thereupon the grant was made, the description being "the surplus of the patrimonial leagues of both Pueblos, and its boundaries are, on the north the league of Santo Domingo, on the south the league of San Felipe." The Spanish Governor ap-

proved the grant, and possession was delivered. It is clear that in 1815 neither the Spanish government nor the pueblo construed the boundaries of the two pueblos to be coincident, as it is not to be presumed that the government of Spain granted land that did not belong to it, nor that the pueblo would have consented thereto.

The land so granted in 1815 embraces the land in controversy. In 1898 an application was made to the Court of Private Land Claims to confirm the Santa Rosa de Cubero grant. The United States and the two pueblos were represented. After hearing all the testimony offered, the grant was confirmed, and two of its boundaries fixed as the north and south lines of the two pueblos. This decision has no binding effect, for several reasons, but, in dealing with obscure boundaries in ancient documents, courts must avail themselves of the evidence obtainable. Wigmore on Evidence, § 1580 et seq. The hearings were had before the Court of Private Land Claims thirty-three years ago—in another generation; the witnesses there testifying are in all probability dead; their testimony has been preserved, and we have examined it. In our opinion it supports the conclusion that the Cubero grant was not superimposed on the San Felipe grant. In 1914, the United States issued its patent covering the Cubero grant, the boundaries being identical with those fixed by the decree of the Court of Private Land Claims.

The trial court found that the claimants and their ancestors had been in notorious and exclusive possession of the lands in controversy since 1889, and had paid all the taxes thereon. Under the authorities hereafter cited, we are of the opinion that the evidence sustains such finding. The testimony as to possession and taxes offers, in addition, persuasive proof as to the disputed boundaries.

The appellant relies upon a patent issued by the United States to the pueblo of San Felipe in 1864, pursuant to the Act of Congress of December 22, 1858 (11 Stat. 374). Such patent recites that it "shall only be construed as a relinquishment of all title and claim of the United States to any of said lands and shall not affect any adverse valid rights should such exist." This patent is based upon a survey made in 1859, the surveyor's map and notes being incorporated in the patent. In making this survey, the surveyor should have undertaken to run the lines in accordance with the grant. But the northern boundary as described in the grant, "the Bosque Grande which is toward the east," was apparently disregarded. The surveyor started on the east line of the grant, ran south and then west; he then proceeded northerly along the west boundary and ran his lines until he intersected the south boundary of the Santo Domingo grant; he then ran southeasterly along the south boundary of the Santo Domingo grant for six miles, and then ran south to the point of beginning. The only mention of the Bosque Grande is with reference to the southeasterly six-mile call, where he says that "the last half mile is first rate river bottom land, cultivated and irrigated, known as the Bosque Grande." Nowhere is the Bosque Grande indicated as a boundary in the survey; nor is there evidence that the Bosque Grande of 1859 is the same woods referred to in 1689. Nor is there any evidence that any effort was made by the surveyor to ascertain and establish the boundary named in the grant; on the contrary, it appears that he ignored the description in the 1689 grant, and the existence of the 1815 grant, and undertook to establish a different boundary for the pueblo, to wit, the "south boundary of the Pueblo of Santo Domingo." Treating the survey as competent evidence as to the location of this obscure boundary, we are nevertheless persuaded that the more persuasive evidence is opposed, and that the trial court correctly held that the Cubero grant of 1815 was not superimposed upon the 1689 grant to the pueblo of San Felipe.

The appellant also relies upon a deed made in 1818 by one Quintana to the pueblo of San Felipe purporting to convey "a half ranch of untilled lands which ranch is between the leagues of the Pueblos of Santo Domingo and San Felipe," the half conveyed being that which the grantor was entitled to by inheritance from his deceased father, and which the Alcalde had decreed to him in 1816. There is no evidence that this deed was recorded, nor that it was delivered, nor that possession of the land was formally delivered under it, as was the then custom. It appears in this record because it was one of the exhibits in litigation commenced in 1819 by Fernandez, one of the co-owners of the Cubero grant, against Quintana, the other owner and the grantor in this deed. One of the complaints of Fernandez was that Quintana had sold part of the grant without the consent of Fernandez. A decree was entered in this action in 1820, and, notwithstanding that the deed in question was exhibited and in issue, it was held that: "As the right of Jose Alejandro Quintana results from the proceedings let it be declared for him in due form."

In 1855 an instrument was executed by Fernandez, which appellant contends is confirmatory of the deed of 1818; that instrument is supposedly executed by an heir of Fernandez, and not Quintana; it refers to a conditional donation of 1815, and is of no assistance. There is no evidence that any possession followed either of these instruments, and we agree with the trial court that the evidence concerning them is too shadowy to serve as a muniment of title. The decree of the trial court as to complaint No. 71 is affirmed.

## The Algodones Claimants.

The remaining appellees, in their answer, assert title by adverse possession, and also under a deed made by the pueblo of San Felipe in 1826. The trial court sustained their defense on the ground of adverse possession, but denied relief to others (who have not appealed) who also claimed under the 1826 deed. The record discloses no formal delivery of possession under such deed. The appellant asserts that, under both Spanish and Mexican law, deeds of Indians required governmental approval. This is the law. In Choteau v. Molony, 16 How. 203, 229, 14 L. Ed. 905, it was held that, under Spanish law, an Indian could not sell without consent of the king, given directly under the king's sign manual or by confirmation of his governors. United States v. Pico, 5 Wall. 536, 18 L. Ed. 695; United States v. Candelaria, 271 U. S. 432, 442, 46 S. Ct. 561, 70 L. Ed. 1023; Sunol v. Hepburn, 1 Cal. 254, 273, deal with Mexican law, and are to the same effect. The questions remain, however, as to what governmental authority was empowered to approve of such a conveyance, and in what manner such approval was manifested. The instrument in question is executed by the Alcalde, and recites that those authorized to act for the pueblo appeared before him and declared that they had transferred the land in controversy. The law placed a heavy penalty upon an Alcalde who sanctioned a conveyance by Indians which did not have governmental approval, and invalidated such conveyances. Sunol v. Hepburn, supra. These circumstances, together with the presumption of validity attaching to ancient documents, present serious and difficult questions which are not adequately treated in the briefs or the record. This indicates that the validity of the deed was not asserted in the lower court, for, in the series of cases before this court dealing with pueblo lands, we have been greatly assisted by the briefs, particularly those submitted by Mr. Fraser, counsel for the government. There may be evidence available as to what authority, under Mexican law, was empowered to approve of such conveyance, and as to the customary method of the exercise of such power. The absence of any such evidence in this record, or of any assistance in the briefs, may be accounted for by the fact that counsel for appellees expressly disclaims that the deed of 1826 is effective as a fee title, but relies upon it simply as constituting color of title. We accept the disclaimer, and treat the deed as color of title, without passing upon the other questions suggested. The disclaimer affects but 1.51 acres of land, of insignificant value.

The decree must be reversed as to four of the claims under the authority of Pueblo de Taos v. Gusdorf (C. C. A.) 50 F.(2d) 721, since the evidence is undisputed that tax sales interrupted the continuity of the adverse possession relied upon by claimant.[2]

The appeal as to the remaining claims presents the single question of the sufficiency of the evidence to sustain the findings of the trial court as to adverse possession; in each case the claimant had color of title and had paid all the taxes assessed since 1902. In each case the trial court saw and heard the witnesses, and his findings are not lightly to be overturned. It would serve no useful purpose to set out the evidence on each claim; much of the land involved is uncultivated, not irrigated, unfenced, and of little value; the claimant would cultivate a small tract near his house, and would use the rest for pasture; being unfenced, other cattle would sometimes graze on the land, either with or without permission of the claimant; sometimes he was diligent about driving other stock off, and sometimes not. The appellant claims that such a possession is not sufficient under the statute.

No hard and fast rule can be laid down as to what acts are sufficient to constitute adverse possession, since all the circumstances, and particularly the location and nature of the land must be considered. In Ewing v. Burnet, 11 Pet. 41, 53, 9 L. Ed. 624, the Supreme Court said: "So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases. But it may with safety be said, that where acts of ownership have been done upon land, which, from their

[2] Claims Nos. 33 and 77, Ricardo Perea; No. 57, Manuel Lopez; No. 66, Ernesto Griego.

nature indicate a notorious claim of property in it, and are continued for twenty-one years, with the knowledge of an adverse claimant without interruption, or an adverse entry by him, for twenty-one years; such acts are evidence of an ouster of a former owner, and an actual adverse possession against him; if the jury shall think, that the property was not susceptible of a more strict, or definite possession than had been so taken, and held. Neither actual occupation, cultivation, nor residence, are necessary to constitute actual possession ([Barclay v. Howell], 6 Pet. 513 [8 L. Ed. 477]), when the property is so situated as not to admit of any permanent useful improvement, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim."

To the same effect, see Harris v. McGovern, 99 U. S. 161, 167, 25 L. Ed. 317; 2 C. J. 79. In 1 R. C. L. p. 694, the author states: "From what has been stated heretofore it is evident that in determining what will amount to an actual possession of land considerable importance must be attached to its nature, and the uses to which it can be applied, or to which the claimant may choose to apply it. What is adverse possession is one thing in a populous country, another thing in a sparsely settled one, and still a different thing in a town or village. So, what will constitute adverse possession of land not susceptible of being devoted to any profitable use might not necessarily of agricultural land or any other susceptible of being so devoted. What would be effective for that purpose as to lands wholly or partially overflowed by water might not as to a building lot in a city. What would satisfy such purpose in respect to a marsh or swamp, not usually put by the owner to any other use than that of a hunting and fishing ground, might not as to premises of any other character. The governing questions of law, regardless of the character of the premises, are the same in every case, but the question of fact may be presented by evidence in a great variety of ways, according to the circumstances."

Considering the character and location of the tracts involved, we are quite satisfied with the finding of the trial court that these claimants put these lands to the only uses to which they are adapted, and to the same uses as would an owner of the fee.

 In some of the cases, an irrigation ditch, or a highway, or a railroad, cut through the tract after the claimant's entry, and separated a small portion from the house. The claimant continued to pay taxes on the entire tract; but because of the difficulty of access, and the worthlessness of the tract cut off—an acre of swamp, or a half acre of hillside—the claimant put the remnant to very little or no use. There was no affirmative act of abandonment, no disseizure, no one else in possession; but, because of the circumstance of nonuser, the government contends that these scattered and worthless fragments, aggregating less than forty acres, should be restored to the pueblo. We do not agree. These claimants went into possession under color of title; under such color, they were in actual possession of the entire tract until the improvement cut off a part. While it is true that there must be actual possession, as distinguished from constructive possession, before there can be an adverse possession whether under color of title or otherwise, there is a well-settled distinction between the *extent* of the actual possession when there is color of title and when there is not. When there is an entry under color of title, and actual and adverse possession of part, the possession is presumably of the tract covered by the color, unless there is some one else in possession of part. In Smith v. Gale, 144 U. S. 509, 525, 526, 12 S. Ct. 674, 679, 36 L. Ed. 521, the Supreme Court held: "While their actual occupancy and cultivation of the property did not apparently extend to the entire tract, we think it was sufficient, under the case of Ellicott v. Pearl, 10 Pet. 412 [9 L. Ed. 475], to give the Gales a constructive possession of the whole tract, the remainder not being in the adverse possession of anybody. In that case it was held that, where there has been an entry on land under color of title by deed, the possession is deemed to extend to the bounds of that deed, although the actual settlement and improvements are on a small parcel only of the tract. In such case, where there is no adverse possession, the law construes the entry to be co-extensive with the grant to the party, upon the ground that it is his clear intention to assert such possession. So, also, Ewing v. Burnet, 11 Pet. 41, 52 [9 L. Ed. 624]; Brobst v. Brock, 10 Wall. 519, 532 [19 L. Ed. 1002]; Hunnicutt v. Peyton, 102 U. S. 333 [26 L. Ed. 113]."

Corpus Juris states the rule as follows: "The general rule is well settled that where a person enters, under color of title, into the actual occupancy of a part of the premises described in the instrument giving color of title, his possession is not considered as con-

fined to that part of the premises in his actual occupancy, but that such occupant acquires possession of all the lands embraced in the instrument under which he claims, provided of course there is no other person or persons else who are in the actual occupancy of the part of the premises not actually occupied by him." 2 C. J. 235–6.

Cases from 43 jurisdictions are cited in support of the statement, and none to the contrary. See, also, Houston Oil Co. v. Goodrich (C. C. A. 5) 213 F. 136; Ramas v. Director of Lands, 39 Philippine I. 180; 1 R. C. L. 728.

The decree is reversed as to complaint No. 1, private claim No. 12, Manuel C. de Baca; complaints Nos. 3 and 20, private claims Nos. 33 and 77, Ricardo Perea; complaint No. 9, private claim No. 57, Manuel Lopez; complaint No. 14, private claim No. 66, Ernesto Griego; otherwise affirmed.