**PUEBLO OF SANTA ANA,**
Plaintiff–Appellee,

v.

**Alfredo BACA and Mary Lou Baca,**
Defendants–Appellants.

No. 86–1337.

United States Court of Appeals,
Tenth Circuit.

March 25, 1988.

Richard W. Hughes of Luebben, Hughes, Tomita & Borg, Albuquerque, N.M., for plaintiff-appellee.

Mary E. McDonald of Sutin, Thayer & Browne, Santa Fe, N.M., for defendants-appellants.

Before MOORE and ANDERSON, Circuit Judges, and PHILLIPS, District Judge.*

JOHN P. MOORE, Circuit Judge.

■ This is an appeal from the district court's judgment allowing Santa Ana to eject defendants Alfredo Baca and Mary Lou Baca from a 131–acre parcel of land and to recover damages caused by their trespass. Defendants argue the district court erred in relying upon the boundaries established by an 1813 adjudication, rather than upon the boundaries set forth in an official United States survey. Defendants also believe the court should not have determined that Santa Ana acquired title to the disputed property by adverse possession.[1] We agree with the district court that the boundaries of the grant in question are more accurately determined by the adjudication than by the United States survey. We also conclude that Santa Ana adversely possessed this land and should be entitled to absolute ownership. We therefore affirm the district court's findings.

## I.

The relevant history of the disputed parcel begins in the early 1700s, when the Pueblo of Santa Ana began purchasing lands along the Rio del Norte (Rio Grande) in New Mexico. Until this time, the Pueblo had lived and farmed along part of the Rio Jemez upstream from its confluence with the Rio del Norte. Shortages of water caused by droughts and upstream diversions of water by Spanish settlers forced the Pueblo to search elsewhere for better farming land. Beginning in 1709, Santa Ana completed a series of purchases from Spanish settlers and eventually amassed sizeable tracts of land on both sides of the Rio del Norte. In 1763, Santa Ana purchased for 3000 pesos a large tract of land later confirmed as the El Ranchito, in which the disputed parcel is situated. The deed stated that the parcel stretched from the Rio del Norte on the west to the foothills of the Sandias on the east. The property also extended north to the "middle of Angostura where is placed a cross and bounded with the property of the Pueblo of

---

* Honorable Layn R. Phillips, United States District Judge for the Western District of Oklahoma, sitting by designation.

1. Defendants also believe Santa Ana's claim of title is barred by the Pueblo Lands Act, which provides in § 4 that Pueblo Indians may bring an action to establish title to land but only before the filing of plats and field notes. The Act of May 31, 1933, extended this limitation period to bring an action up to one year after the adoption of the Act if Pueblos did not elect to accept amounts appropriated to compensate them for abandoning lawsuits claiming title. According to defendants, Santa Ana's suit against them is barred because it was brought more than forty years after the enactment of the Act of May 31, 1933.

The Pueblo Land Act, however, was intended only to oblige non-Indians to prove claims to Pueblo land; Pueblos could only file suit in response to claims made against them by non-Indians. The Act, therefore, did not provide a device for deciding land disputes between Indians. Furthermore, Santa Ana had no reason to file suit under § 4 of the Act because no claim was made against it concerning the disputed land. Santa Ana had no notice that its rights to the disputed parcel were jeopardized by non-Indian claims. Rather, the Algodones community filed suit only against San Felipe based on a deed executed by San Felipe to the community in 1826. *See United States v. Algodones Land Co.,* 52 F.2d 359 (10th Cir.1931). Thus, the suit did not affect the rights of Santa Ana to later assert a claim for the property in dispute.

San Felipe." According to Don Bernardo Miera y Pacheco, the appointed overseer of this transaction, "[the land's] boundaries were shown them and they the said natives of the Pueblo ... appropriated the land quietly and peaceably, and the said vendors stated that if the same were or might be worth more, they made them a gift and donation thereof, pure, unconditional, perfect, irreversible."

Tension developed soon after this transaction over the proper placement of the northern boundary. The Pueblo of San Felipe, whose property abutted Santa Ana's land to the north, claimed its grant from Spain contained the northern portion of the area deeded to Santa Ana and began selling parts of this land to Spanish settlers. The Spanish government interceded in this dispute. A local official rode on horseback along Santa Ana's northern boundary, heard testimony, and inspected documents produced by the Indians. He then resolved the dispute in favor of Santa Ana, finding that the northern boundary of Santa Ana's property and the southern boundary of San Felipe's lands was a straight line through the middle of the Angostura settlement. San Felipe appealed this adjudication several times to higher authorities. Five years later, the Pueblo received the opinion of the Real Audiencia of Guadalajara, which essentially sat as the Supreme Court of the territory, affirming the earlier decision and annulling all sales of this area by San Felipe.

A series of land transactions over the next eighty years, many resulting from continued land speculation by the Pueblo of San Felipe, clouded the placement of Santa Ana's northern boundary. By the late 1800s, these sales had caused the relocation of Santa Ana's northern boundary to a point approximately one-half mile south of Angostura without Santa Ana's knowledge. The Court of Private Land Claims confirmed this new northern boundary line in 1897, allowing the new claimants to continue their occupancy of land around Angostura. Subsequent surveys were confused and offered conflicting placements of the boundary. Without resolving this conflict, the General Land Office simply issued overlapping patents to San Felipe and Santa Ana.

In the early 1930s, Santa Ana constructed a fence along the north and east boundaries of the disputed parcel. Santa Ana maintained this fence and regularly grazed cattle within the enclosed area. In October 1980, defendants, who claim ownership to part of the disputed parcel as the successors in interest to the Pueblo of San Felipe, precipitated a claim of ejectment and trespass by tearing down this fence.

In the ensuing suit, the district court found for Santa Ana on every contested issue. It held that Santa Ana had title to the disputed parcel based on its review of the relevant land transactions in the 1700s and the boundary adjudication by Spanish authorities in 1813. The court also found that the original United States survey of the San Felipe property was internally inconsistent and unreliable. Finally, the court reasoned that Santa Ana had at least acquired title through adverse possession. Defendants appeal each of these decisions.

II.

Defendants first argue the United States survey and patenting of the disputed parcel conclusively determined San Felipe's title. Once the United States Government surveys a grant, according to defendants, evidence may not be submitted to contradict the location of the area's boundaries. Defendants quote from *Russell v. Maxwell Land Grant Co.*, 158 U.S. 253, 15 S.Ct. 827, 39 L.Ed. 971 (1895), and *Cragin v. Powell*, 128 U.S. 691, 699, 9 S.Ct. 203, 206–07, 32 L.Ed. 566 (1888), in which the Court stated that a United States survey of a confirmed grant establishes the location of the boundaries against collateral attack in the courts.

Defendants fail, however, to properly distinguish between the determination of private titles against the government and the determination of conflicts solely between private title holders. While the Court in *Russell* and *Cragin* adhered to the rule that an approved survey of a confirmed grant is conclusive against the United

States, it has never applied this rule to disputes among private title holders. Indeed, in several cases the Court has held that a patent is conclusive evidence *only* between the United States and the grantee. In *Henshaw v. Bissell*, 85 U.S. (18 Wall.) 255, 264, 21 L.Ed. 835 (1873), for example, the Court stated:

[W]henever two surveys covering the same tract of land are approved by the political department, and a legal controversy arises respecting the land between claimants under the different surveys, the question which of the two surveys appropriates the premises in dispute is necessarily transferred to the judiciary. The fact that two surveys embrace the same land is itself proof that either one of the original concessions was improvidently issued and to the extent of its interference with the other was inoperative, or that error has intervened in one of the surveys.

The Court reiterated this reasoning in *United States v. Conway*, 175 U.S. 60, 20 S.Ct. 13, 44 L.Ed. 72 (1899), in which it held that the United States had divested itself of any interest in the disputed lands by patenting overlapping grants. The Court expressly allowed conflicting claimants "to resort to the ordinary remedies at law or in equity, according to the nature of the claim." *See also Adam v. Norris*, 103 U.S. (13 Otto) 591, 593, 26 L.Ed. 583 (1880) (a patent is conclusive evidence only as between the United States and the grantee).

These cases indicate that confirmation by the United States is not conclusive and does not decide which claimant has the better right. The very Act which confirmed the San Felipe grant states, "this confirmation shall only be construed as a relinquishment of all title and claim of the United States to any of said lands, and shall not affect any adverse valid rights, should such exist." Act of December 22,

1858, 11 Stat. 374. Therefore, courts must examine other indicia of ownership to resolve disputes of private title holders, including prior land grants, deeds, and adjudications.

■ Defendants argue that even if the United States survey is inconclusive, the district court erred in deciding the Spanish adjudication resolved the boundary dispute in favor of Santa Ana. According to defendants, Santa Ana's expert, Dr. Ward Minge, offered a garbled, inaccurate description of the 1813 adjudication. Defendants also believe neither the 1813 proceedings nor the 1819 affirmance of the proceedings contains any description to identify the location of the relevant boundary area.

We disagree with defendants' contentions. Dr. Minge presented a clear, detailed account of the history of the disputed parcel, including an excellent description of the 1813 adjudication. In May 1813, Santa Ana complained to local officials that San Felipe had sold farmland within its boundaries. An official discussed the dispute with both parties and viewed the area before deciding the issue in favor of Santa Ana. San Felipe successfully petitioned for review. Jose Maria de Arze, the First Lieutenant of the Presidial Company of Santa Fe, held three days of hearings during which both parties submitted documents describing the boundaries of their land. At the conclusion of these hearings, De Arza found that the San Felipe had trespassed on lands owned by Santa Ana. Still dissatisfied, San Felipe appealed to the Real Audiencia in Guadalajara. In March 1818, the Audiencia ruled in favor of Santa Ana and ordered San Felipe to return lands it had sold in the disputed parcel.

We believe Dr. Minge convincingly established that the adjudication settled the ownership of the disputed parcel between Santa Ana and San Felipe.[2] This multi-tiered

---

**2.** Dr. Minge's account of these proceedings is corroborated by the translation of Ralph Emerson Twitchell, the eminent New Mexico lawyer and historian. *See* Twitchell, I *Spanish Archives* *of New Mexico* (1914). According to Mr. Twitchell, for example, De Arza examined San Felipe's chief document, which described San Felipe's lands as bounded by the ranch and lands

judicial system served as a full-scale boundary adjudication with a trial, appeal *de novo*, and further appeal. The decision-makers evaluated a relative wealth of evidence over a considerable period of time. Because of their thorough review of this matter, substantial weight should be given to the findings of the Spanish authorities. Accordingly, we uphold the district court's findings that this adjudication conclusively determined the dispute in favor of Santa Ana.

Finally, defendants place too much emphasis upon the suspect United States survey of the disputed parcel. The field notes of Clements' survey in 1860, which were incorporated into the patent for the San Felipe grant, inconsistently located the southeast corner of the parcel. Mr. Clements described the boundary of the grant as running five and one-half miles due south of the northern boundary. He also located the southern boundary of the parcel, however, just slightly south of San Francisco Creek, which is only four and one-half miles due south. If this creek is considered the southern boundary of the San Felipe grant, there is no overlap with Santa Ana's property. But if the southern boundary is located five and one-half miles due south, than the disputed parcel lies within the boundaries of both San Felipe's and Santa Ana's property.[3]

We agree with defendants that this discrepancy may be explained by assuming Mr. Clements' measuring line wandered to the east. Mr. Clements might have employed accurate distances but failed to set the boundary far enough south because he strayed off course. Still, this inconsistency calls into question the validity of the survey. As mentioned, the 1813 adjudication determined that no overlap existed between the lands owned by Santa Ana and San Felipe. We do not believe an inept survey which Santa Ana had no opportunity to contest should trump the findings of this detailed adjudication and the clear import of the existing documents. Furthermore, it is axiomatic that references to natural monuments in surveys usually control over citations to distances. *See, e.g., Cordova v. Town of Atrisco*, 53 N.M. 76, 201 P.2d 996 (1949). A proper reading of Mr. Clements' field notes, therefore, would locate the southeast corner just south of San Francisco Creek, resulting in no overlap between San Felipe's and Santa Ana's land.

### III.

■ Defendants also argue the court erred in finding that Santa Ana could have acquired ownership to the disputed parcel by adverse possession if it did not already possess good title. For adverse possession to be found, New Mexico law requires clear and convincing evidence that possession is actual, visible, exclusive, hostile, and con-

---

of Cristobal Martin. Then, according to De Arza,

> upon examining the lands it turned out that the San Felipes were trespassing on lands which the Santa Anas had brought from the heirs of Cristobal Martin, as appeared by a certified copy ... that having established substantial monuments of stone and mud, it was acknowledged by both pueblos that they were satisfied with them. These monuments formed a southern boundary for the San Felipes and a northern boundary for the Santa Anas, while a thick cottonwood tree which was asked for as a boundary mark by the San Felipes, notwithstanding it was on lands belonging to the Santa Ana, was denied them because their request was unjust.
> *Id.* at 426–27.

3. Wendell Hall, who surveyed this property in 1907, resolved this discrepancy by ignoring Clements' references to San Francisco Creek. He therefore located the southeast corner of the grant five and one-half miles south, overlapping the northern portion of Santa Ana's land by approximately one-half mile.

tinuous. *E.g., Esquibel v. Hallmark,* 92 N.M. 254, 586 P.2d 1083 (1978).[4] According to defendants, Santa Ana's only evidence that it adversely possessed the disputed property from 1931 is the construction of a fence on the parcel's eastern and northern boundaries and the occasional use of the property for cattle and horse grazing. Defendants claim their family ventured onto the property through gaps in the fence created by flooding, and horses and cattle could only incidentally graze in the area because of lack of water.

We do not believe the district court's decision on this issue is clearly erroneous, particularly since it viewed the disputed parcel, including the fence, and heard witnesses who testified at great length. Adversely possessing property requires the possessor to use the disputed property as an ordinary owner would. His occupancy must only be sufficiently open and notorious to give the true owner adequate notice of his claim. *C & F Realty Co. v. Mershon,* 81 N.M. 169, 171, 464 P.2d 899, 901 (1969); *GOS Cattle Co. v. Bragaw's Heirs,* 38 N.M. 105, 28 P.2d 529 (1933). Therefore, an ironclad fence in perfect repair is not required to give rise to an adverse possession claim.[5] According to several witnesses, Santa Ana generally maintained its fence in adequate condition. Considering this fence extended along the entire northern and eastern boundary of the disputed parcel, we believe it was plainly sufficient to inform any inquiring individual of Santa Ana's occupancy.

Santa Ana also persuasively disputes defendants' characterization of its use of the property. Interruptions in use of the property must be equivalent in force to the possession to defeat adverse possession. *Montoya v. Catron,* 22 N.M. 570, 166 P. 909 (1909). Certainly occasional entries by the title owner are insufficient to interrupt the adverse possession. *Bushey v. Seven Lakes Reservoir Co.,* 37 Colo.App. 106, 545 P.2d 158 (1975); *Almond v. Anderegg,* 557 P.2d 220 (Or.1976). Yet defendants failed to offer any evidence of a significant interruption of Santa Ana's use of the property. Rather, testimony indicates that horses and cattle used the land continuously from the 1930s, except for brief periods in the early 1960s during which Santa Ana leased its land to several nonmembers of the Pueblo. We therefore affirm the trial court's finding that even if Santa Ana did not have good title to the disputed parcel, it acquired this title by adversely possessing this land since the early 1930s.

AFFIRMED.

---

**4.** Specifically, New Mexico requires: (1) actual, visible, exclusive, hostile, and continuous possession; (2) under color of title; (3) for ten years. N.M.Stat.Ann. § 37–1–21 (1978).

**5.** Defendants mistakenly rely on *Johnston v. City of Albuquerque,* 12 N.M. 20, 72 P. 9 (1903). In *Johnston,* the court required a substantial fence completely enclosing the disputed area in order to find adverse possession. The court, though, emphasized the adequacy of the fence because, unlike the instant case, there was no actual use made of the property by the adverse possessor. Also, as mentioned, in later opinions the court's major concern is that the adverse possessor only use the property in a sufficiently open and notorious manner to give the true owner sufficient notice. Indeed, in *GOS Cattle Co. v. Bragaw's Heirs,* 28 P.2d at 531, the court held that continuous use of property can give rise to an adverse possession claim even if the area is not fenced.