941 F.2d 1074
 UNITED STATES of America, on its own Behalf and on Behalf of
The Pueblo of Santo Domingo,
Plaintiff-counter-defendant/Appellant,
and
The Pueblo of Santo Domingo, Plaintiff-intervenor,
v.
Leland THOMPSON, Jr., et al., Defendants-Appellees.
 Nos. 89-2077, 89-2091 and 89-2142.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 12, 1991.
 
 Edward J. Shawaker, Atty. Dept. of Justice, Washington, D.C. (Donald A. Carr, Acting Asst. Atty. Gen., and Myles E. Flint, Deputy Asst. Atty. Gen., Dept. of Justice, Washington, D.C., William L. Lutz, U.S. Atty., and Herbert A. Becker, Asst. U.S. Atty., Albuquerque, N.M.; Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., with him, on the briefs) for plaintiff-counter-defendant/appellant U.S.
 Scott E. Borg (Sarah W. Barlow with him, on the briefs), Rosenfelt, Barlow & Borg, Albuquerque, N.M., for plaintiff-counter-defendant/appellant The Pueblo of Santo Domingo.
 David F.B. Smith (William T. Finley, Jr., and Kevin W. McLean with him, on the brief), Pierson Semmes and Finley, Washington, D.C., for defendants-appellees.
 Before LOGAN, ANDERSON and EBEL, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Plaintiffs, the Pueblo of Santo Domingo and the United States, as trustee for the Pueblo, brought this suit to quiet title to approximately 24,000 acres of land in New Mexico that were part of a seventeenth century Spanish land grant to the Pueblo. Defendants are non-Indian claimants to the land under a subsequent Spanish grant. The district court entered summary judgment for defendants, finding that the Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636, as amended by Act of May 31, 1933, ch. 45, 48 Stat. 108, created a statute of limitations that now bars this action. United States v. Thompson, 708 F.Supp. 1206 (D.N.M.1989). Plaintiffs appeal.
 
 
 2
 * The Pueblo trace their title to the land from a 1689 grant by Spain, which was confirmed by Congress in 1858 and patented in 1864. Defendants trace their title from a 1782 grant known as the Mesita de Juana Lopez Grant, which Congress confirmed in 1879. Approximately 24,000 acres are overlapped by both grants and are referred to as "the overlap land."
 
 
 3
 In response to uncertainty over the titles to Pueblo land,[1] Congress passed the Pueblo Lands Act of June 7, 1924 (PLA), ch. 331, 43 Stat. 636. The PLA established the Pueblo Lands Board (Board) to examine and resolve non-Indian claims to Pueblo lands. Section 2 directed the Board to issue a report describing "any land granted or confirmed to the Pueblo Indians of New Mexico by any authority of the United States of America, or any prior sovereignty, or acquired by said Indians as a community by purchase or otherwise, title to which the said board shall find not to have been extinguished in accordance with the provisions of this Act...." Id. § 2, 43 Stat. at 636. The Board was to examine the claims of non-Indians and extinguish Pueblo title only when it determined that the non-Indians had met certain adverse possession and tax payment requirements of § 4. Id. §§ 2 & 4, 43 Stat. at 636-37.
 
 
 4
 Once the § 2 report was issued, the Attorney General was to bring a quiet title action in United States district court for all lands described in the report for which the Board had determined Pueblo title was not extinguished. Id. §§ 1 & 3, 43 Stat. at 636-37. Any non-Indian whose claims the Board had not accepted could raise an adverse possession defense before the district court, and the court could extinguish Pueblo title if it found that the claimant had met the § 4 adverse possession criteria. In addition, the Pueblo could sue to assert their property rights under an independent suit provision of § 4. Id. § 4, 43 Stat. at 637.
 
 
 5
 Section 13 required the Secretary of Interior (Secretary) to file plats and field notes for the lands to which Pueblo title had been extinguished, thereby vesting title in the non-Indian claimants. Id. § 13, 43 Stat. at 640. The Secretary could not file the plats and field notes until at least two years had passed from the filing of the Board's § 2 report. Id.
 
 
 6
 In § 14, Congress attempted to settle title to lands with overlapping Spanish grants. Section 14 contemplated that the Pueblo would retain title to and possession of all overlap land, even if a non-Indian claimant had superior title. See id. § 14, 43 Stat. at 641. Congress then would consider compensating the non-Indian claimant. See id.
 
 
 7
 As the district court stated, "[a]t issue in this case is the Board's § 2 report on the Pueblo of Santo Domingo." Thompson, 708 F.Supp. at 1210. The report stated that
 
 
 8
 "having investigated the lands within the exterior boundaries of the land ... confirmed to the Pueblo of Santo Domingo as shown on blue print map hereto attached and marked 'Exhibit A', being a Spanish Grant ..., [the Board] has determined, and hereby determines, that title thereto in said Pueblo has not been extinguished in accordance with the provisions of said Act of June 7, 1924, as to the lands described and set forth by metes and bounds as follows, except certain tracts marked 'Exceptions 1 to 36', inclusive, and indicated on blue print map hereto attached and marked 'Exhibit B', and except the lands over-lapped by the La Majada, Sitio de Juana Lopez and Mesita de Juana Lopez grants shown on blue print map hereto attached and marked 'Exhibit A',...."
 
 
 9
 Pueblo Lands Board, Santo Domingo Pueblo, Report on Title to Lands Granted or Confirmed to Pueblo Indians Not Extinguished 1-2 (Dec. 29, 1927), IV Addendum of Exhibits, Ex. E-1 (emphasis added). No claims by non-Indians were presented to the Board for the overlap land, although it appears that Exceptions 1 to 36 were based on non-Indian claims.
 
 
 10
 The United States, pursuant to § 3 of the PLA, filed a quiet title action on behalf of the Pueblo but expressly excluded the overlap land. The quiet title complaint asserted that the Board had "determined that the Indian title to certain portions [including the overlap land] of the patented land hereinabove described has been extinguished, and that title to said portions now vests in various owners other than said Pueblo and said Indians ... and no relief is here asked as to the land included therein." Government's Bill of Complaint in United States v. Montoya, No. 1830 Equity (D.N.M.1929), IV Addendum of Exhibits, Ex. E-6 at 5; see also Stipulation of the Parties, R. tab 766 at 6, p 9. Plats and field notes were filed for the specific parcels for which non-Indians had presented claims (i.e., Exceptions 1 to 36), but there is no evidence that plats and field notes were ever filed for the overlap land.[2] The instant action was not filed until March 9, 1984.
 
 
 11
 On appeal, plaintiffs' contentions can be grouped into four general alternative arguments, as follows: (1) the § 4 independent suit provision does not contain a statute of limitations; (2) even if § 4 does include a statute of limitations, Congress did not intend it to apply to the overlap land; (3) no statute of limitations can operate against the federal government without its express consent and, therefore, the government may maintain this action even if the Pueblo cannot; and (4) the statute of limitations does not run until the plats and field notes are filed, a condition that has not been satisfied with respect to the overlap land.
 
 
 12
 There are no disputed material facts. We review the district court's application of law de novo. See Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988).
 
 II
 
 13
 We first consider whether the PLA § 4 independent suit provision contains a statute of limitations. " 'The starting point in every case involving construction of a statute is the language itself.' " International Bhd. of Teamsters v. Daniels, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). "When the terms of the statute are clear and unambiguous, that language is controlling absent rare and exceptional circumstances." Wilson v. Stocker, 819 F.2d 943, 948 (10th Cir.1987). The relevant portion of § 4 is its independent suit provision:
 
 
 14
 "Nothing in this Act contained shall be construed to impair or destroy any existing right of the Pueblo Indians of New Mexico to assert and maintain unaffected by the provisions of this Act their title and right to any land by original proceedings, either in law or equity, in any court of competent jurisdiction and any such right may be asserted at any time prior to the filing of the field notes and plats as provided by section 13 hereof,...."
 
 
 15
 PLA § 4, 43 Stat. at 637.
 
 
 16
 That section authorized the Pueblo to sue on their own behalf to protect their title. Defendants argue that it also established a time limit after which the Pueblo could no longer challenge the Board's extinguishment of their title. Plaintiffs disagree, contending that the section provided a "grace period" during which the Pueblo could sue as if the PLA had never been enacted and after which the Pueblo could sue at any time but subject to the PLA. The district court found that the meaning of independent suit provision "cannot be determined from the plain language of the statute. Without resort to the legislative history, [it] is susceptible to the meanings ascribed it both by plaintiffs and by defendants." Thompson, 708 F.Supp. at 1212. We agree that the statutory language is ambiguous on its face as applied to the statute of limitations issue before us.
 
 
 17
 Plaintiffs argue that ambiguous statutory language must be construed in favor of the Indians. The district court, citing Mountain States Tel. & Tel. Co. v. Santa Ana, 472 U.S. 237, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985), rejected this canon of statutory construction. Thompson, 708 F.Supp. at 1212 n. 7. Instead, the court examined the PLA's legislative history and overall structure, and determined that Congress intended to create a statute of limitations on Pueblo claims. Id. at 1214-15. Plaintiffs contend that the court applied the wrong canon of statutory construction.
 
 
 18
 We need not decide whether the district court correctly read Mountain States, because even under plaintiffs' theory, the court may consider legislative history in determining the meaning of statutory language that is ambiguous on its face. The cases cited by plaintiffs stand for the proposition that when congressional intent with respect to an Indian statute is unclear, courts will presume that Congress intended to protect, rather than diminish, Indian rights. Reference to the legislative history, however, often will resolve uncertainties about the intent of Congress. See Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 177-78, 109 S.Ct. 1698, 1707-08, 104 L.Ed.2d 209 (1989) (applying canon that federal statutory ambiguities are to be resolved in favor of tribal independence, Court considered both statute's language and legislative history to determine congressional intent); Montana v. Blackfeet Tribe, 471 U.S. 759, 766-67, 105 S.Ct. 2399, 2403-04, 85 L.Ed.2d 753 (1985) (construing statute liberally in favor of Indians, Court examined both text and legislative history to ascertain congressional intent); County of Oneida v. Oneida Indian Nation, 470 U.S. 226, 247-48, 105 S.Ct. 1245, 1258-59, 84 L.Ed.2d 169 (1985) (proper inquiry is whether congressional intent is plain and unambiguous); Antoine v. Washington, 420 U.S. 194, 199-200, 205, 95 S.Ct. 944, 948, 951, 43 L.Ed.2d 129 (1975) (liberal construction in favor of Indians did not preclude search for congressional purpose in statutes themselves or their legislative history); DeCoteau v. District County Court, 420 U.S. 425, 444-45, 95 S.Ct. 1082, 1092-93, 43 L.Ed.2d 300 (1975) (although clear congressional intent is required to terminate Indian reservation, such intent may be clear from surrounding circumstances and legislative history); EEOC v. Cherokee Nation, 871 F.2d 937, 939 (10th Cir.1989) (court is to apply special canons of construction in favor of Indians when there is no clear indication of congressional intent, as manifested by legislative history or comprehensive statutory plan).
 
 
 19
 The PLA's legislative history reveals that Congress intended a statute of limitations to apply to suits by the Pueblo challenging extinguishment of their title. The Senate report on the bill that was enacted as the PLA stated that the legislation would "provide for the final adjudication and settlement of a very complicated and difficult series of conflicting titles affecting lands claimed by the Pueblo Indians of New Mexico." S.Rep. No. 492, 68th Cong., 1st Sess. 3 (1924), III Addendum of Exhibits, Ex. A-4 (emphasis added). See also Mountain States, 472 U.S. at 240, 105 S.Ct. at 2589. The report referred several times to the need to resolve the disputes over Pueblo land that had created havoc in New Mexico. See S.Rep. No. 492 at 5, 11. The House report adopted the Senate report and incorporated it therein. See H.R.Rep. No. 787, 68th Cong., 1st Sess. (1924), III Addendum of Exhibits, Ex. A-3.
 
 
 20
 Not every mention of "limitations" or "statute of limitations" in House and Senate reports or in hearings and debates referenced a time limit on the Pueblo's right to bring independent suits. On careful reading, it appears that members of Congress often used those terms to refer to the period of adverse possession by non-Indian claimants that would defeat Pueblo title under § 4. Nevertheless, members of Congress repeatedly expressed concern throughout the hearings and debate that these complicated title disputes reach a final resolution. See Pueblo Indian Lands, Hearings on S. 3865 and S. 4223 Before the Senate Comm. on Public Lands and Surveys, 67th Cong., 4th Sess. 66 (1923) (question of Sen. Jones) (hereinafter "Senate Hearings "), I Addendum of Exhibits, Ex. LCK 7 at 68; id. at 102, Ex. LCK 7 at 96 (statement of Sen. Bursum); id. at 103, Ex. LCK 7 at 96 (exchange between Sen. Jones and Charles H. Burke, Commissioner of Indian Affairs); id. at 104, Ex. LCK 7 at 97 (exchange between Sen. Lenroot and Col. Ralph E. Twitchell, Special Assistant to the Attorney General); Pueblo Indian Land Titles: Hearings on H.R. 13452 and H.R. 13674 Before the House Comm. on Indian Affairs, 67th Cong., 4th Sess. 14, 64 (1923) (statements of Rep. Gensman) (hereinafter "House Hearings "), II Addendum of Exhibits, Ex. LCK 8 at 195, 220; id. at 22, 71, Ex. LCK 8 at 199, 223 (statements of Rep. Snyder); id. at 40, 56, 265, Ex. LCK 8 at 208, 216, 320 (statements of Rep. Roach); id. at 150, Ex. LCK 8 at 263 (exchange between Rep. Leatherwood and Col. Twitchell). See also Senate Hearings at 10, Ex. LCK 7 at 50 (testimony of Commissioner Burke). We find no evidence anywhere to support plaintiffs' reading of the statute.
 
 
 21
 A memorandum by A.A. Berle, Jr., a prominent New York attorney and advocate for the Pueblo who was involved in negotiations over the PLA, further reveals the prevalent thinking among those who negotiated the version of the legislation that was enacted. Berle wrote, "After such filing [of the plats and field notes], the title of the non-Indian claimants becomes absolute. This is because in common justice, the non-Indian settlers on these lands should either be thrown out or have their titles confirmed. The Indians should not be permitted to keep their claims alive for an indefinite period but should assert them now or, if they do not care to do this, should accept compensation." Memorandum, Pending Pueblo Land Legislation 4 (Feb. 14, 1924), II Addendum of Exhibits, Ex. LCK 19 at 465. Francis C. Wilson, another attorney and Pueblo advocate, perceived the legislation similarly. See House Hearings at 346, Ex. LCK 8 at 361 (statement of Francis C. Wilson).
 
 
 22
 If we had doubt concerning applying a limitations period to the Pueblo, it was erased by the subsequent amendment of the PLA. In 1933 Congress amended the PLA to authorize settlement of suits brought by various Pueblos and to increase the amount of federal compensation paid to the Pueblo for extinguishing title to portions of their lands. Act of May 31, 1933, ch. 45, 48 Stat. 108. The amendment authorized the Secretary to offer the Pueblo additional compensation if they would abandon pending or contemplated lawsuits. The Pueblo either could accept this offer by notifying the Secretary in writing, see id. § 6, 48 Stat. at 110-11, or
 
 
 23
 "if said election by said pueblo be not made, said pueblo shall have one year from the date of the approval of this Act within which to file any independent suit authorized under section 4 of the Act of June 7, 1924, at the expiration of which period the right to file such suit shall expire by limitation."
 
 
 24
 Id. § 6, 48 Stat. at 111. Congress thus substituted a specific date of repose (i.e., one year from the enactment of the 1933 Act) for a statute of limitations that had been tied to the filing of plats and field notes. In doing so, it reaffirmed its intent that "litigations and pending and potential litigations, affecting the ownership of these Pueblo lands, will be forever ended." S.Rep. No. 73, 73d Cong., 1st Sess. 17 (1933) (letter from Secretary of Interior to Chairman of the Senate Committee on Indian Affairs, expressly incorporated in Senate report), III Addendum of Exhibits, Ex. B-4.
 
 
 25
 Statutes of limitations are enacted because,
 
 
 26
 "in the judgment of most legislatures and courts, there comes a point at which the delay of a plaintiff in asserting a claim is sufficiently likely either to impair the accuracy of the fact-finding process or to upset settled expectations that a substantive claim will be barred without respect to whether it is meritorious."
 
 
 27
 Board of Regents v. Tomanio, 446 U.S. 478, 487, 100 S.Ct. 1790, 1796, 64 L.Ed.2d 440 (1980). Congress was concerned about the uncertainty of both Pueblo and non-Indian rights created by the unsettled land disputes. Additionally, complicated title questions would only become more obfuscated with time. In light of the overwhelming evidence of congressional intent to reach a final resolution of these issues, we agree with the district court that § 4 of the PLA, as amended in 1933, contains a statute of limitations. See Pueblo of Santa Ana v. Baca, 844 F.2d 708, 709 n. 1 (10th Cir.1988).
 
 III
 
 28
 Next we consider whether the statute of limitations applies to the overlap lands, which we regard as the most difficult issue in this case. We note at the outset that the parties do not dispute the meaning of § 14 of the PLA. Section 14 provided
 
 
 29
 "if any non-Indian party to any such suit shall assert against the Indian title a claim based upon a Spanish or Mexican grant, and if the court should finally find that such claim by the non-Indian is superior to that of the Indian claim, no final decree or judgment of ouster of the said Indians shall be entered or writ of possession or assistance shall be allowed against said Indians, or any of them, or against the United States of America acting in their behalf. In such case the court shall ascertain the area and value of the land thus held by any non-Indian claimant under such superior title,.... When such finding adverse to the Indian claim has become final, the Secretary of the Interior shall report to Congress the facts, including the area and value of the land so adjudged against the Indian claim, with his recommendations in the premises."
 
 
 30
 PLA § 14, 43 Stat. at 641. The section plainly meant that "Congress intended that the Pueblo Indians retain title to all overlap lands, even when the non-Indian claimants under the grants had superior title." Thompson, 708 F.Supp. at 1213. In extinguishing Pueblo title to the overlap land, the Board ignored an express congressional directive. Moreover, "no claims pursuant to the adverse possession criteria of § 4 were ever presented to the Board by or on behalf of non-Indian claimants to the overlap lands." Id. at 1211 (citing Stipulation of the Parties, R. tab 766 at 4, p 3). The issue here, however, is not whether the Board's actions could withstand legal challenge, but whether that challenge could be brought in the form of a quiet title action in 1984.
 
 
 31
 Plaintiffs argue that the Board had no authority to extinguish Pueblo title to the overlap land. They assert, in effect, that the provisions of PLA § 14 vest title in the Pueblo in the overlap land, and that the Board's action, finding the title to be vested in others, is void. We disagree. Section 2 of the PLA provided,
 
 
 32
 "It shall be the duty of said board to investigate, determine, and report and set forth by metes and bounds, illustrated where necessary by field notes and plats, the lands within the exterior boundaries of any land granted or confirmed to the Pueblo Indians of New Mexico by any authority of the United States of America, by purchase or otherwise, title to which the said board shall find not to have been extinguished in accordance with the provisions of this Act...."
 
 
 33
 PLA § 2, 43 Stat. at 636 (emphasis added). Under the broad authority granted by Congress, the Board could determine Pueblo title to any land, including overlap land, granted or confirmed by any authority of the United States, including Congress. The United States, once the Board determined title, was to bring suit to have a court confirm or reject the Board's findings. Id. § 3. This the United States did, and although the Board's actions as to the overlap land were contrary to the intent, indeed the specific mandate, of Congress we hold that it was within its jurisdiction to do so.
 
 
 34
 We do not believe that the admonition in § 14 directing the Board to give title to overlap land to the Pueblo can be treated as jurisdictional in the same sense as the § 2 grant of the Board's power to determine ownership. Thus, the Board's actions were "voidable" rather than "void" when it acted contrary to § 14's direction. Only void judgments are subject to collateral attack. The plain language of the statute puts the overlap land within the Board's jurisdiction, and challenges to the legality of Board actions had to be brought within the statutory time limit.[3] When the scheme established by Congress is clear from the statute's language and legislative history, the courts cannot intervene to remedy unintended consequences.[4]
 
 IV
 
 35
 Plaintiffs also argue that the PLA's statute of limitations cannot operate against the federal government. They cite several cases for the proposition "that the United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations unless congress has clearly manifested its intention that they should be so bound." United States v. Nashville, Chattanooga & St. Louis Ry. Co., 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886). See also United States v. Frank B. Killian Co., 269 F.2d 491, 494 (6th Cir.1959); Illinois Central R.R. Co. v. Rogers, 253 F.2d 349, 352 (D.C.Cir.1958). They also note that 28 U.S.C. § 2415(c) does not provide any statute of limitations against the federal government for actions to establish title to real property.
 
 
 36
 In the instant case the federal government is suing as trustee for the Pueblo, to assert Pueblo title to the overlap land, not to assert its own title. The government therefore stands in the shoes of the Pueblo and must be bound by the clear import of the PLA's specific provisions. We do not have here an attempt to apply a state statute of limitations against the federal sovereign. Instead, Congress itself imposed a time bar on assertions of Pueblo title to land for which Pueblo title had been extinguished. The purpose of Congress would be frustrated if we allowed the federal government to bring the instant suit on behalf of the Pueblo. The statute of limitations would be meaningless. Congress intended the federal government, in a case like this, to be subject to the same statute of repose that operates against the Pueblo.
 
 V
 
 37
 Finally, we consider plaintiffs' contention that the statute of limitations has not run. They rely on the language of § 4 of the PLA, as enacted in 1924, and the fact that no plats or field notes have been filed for the overlap land.
 
 
 38
 As discussed in Part II above, the 1933 Act amending the PLA substituted a more definite statute of limitations for the less certain provisions of the original statute. The plain language of the 1933 Act provided that unless the Pueblo entered into an agreement with the Secretary to abandon pending or contemplated § 4 suits in exchange for additional compensation, the right to bring any § 4 suit challenging the extinguishment of Pueblo title would expire one year following the statute's enactment. See Act of May 31, 1933, ch. 45, § 6, 48 Stat. 108, 111. Plaintiffs argue that Congress intended the 1933 Act to apply only to certain lands in dispute at the time, not to the overlap land in question here. We see nothing on the face of the act's language limiting the new statute of limitations to any particular land. The language is both broadly worded and clear, and we will not reach into the more speculative legislative history to construe it otherwise. Wilson, 819 F.2d at 948. Thus, the statute of limitations ran on May 31, 1934.
 
 
 39
 AFFIRMED.
 
 
 
 [1]
 In United States v. Joseph, 94 U.S. 614, 24 L.Ed. 295 (1877), the Supreme Court held that the Pueblo Indians were not "Indian tribes" within the meaning of the Nonintercourse Act and therefore were not prohibited from alienating their land. Relying on Joseph, 3,000 non-Indians acquired putative title to Pueblo land. Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 243, 105 S.Ct. 2587, 2591, 86 L.Ed.2d 168 (1985). In 1913 the Supreme Court held that congressional prohibitions on the introduction of liquor into Indian lands included the Pueblo. United States v. Sandoval, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913). In discrediting Joseph, the Sandoval Court cast doubt on the ability of the Pueblo to alienate their lands and therefore on the validity of the titles acquired by non-Indians. See Mountain States, 472 U.S. at 243, 105 S.Ct. at 2591. The Court did not resolve the uncertainty until 1926, United States v. Candelaria, 271 U.S. 432, 441-42, 46 S.Ct. 561, 562-63, 70 L.Ed. 1023 (1926) (expressly holding that the Nonintercourse Act applied to the Pueblo Indians). During the interim Congress passed the Pueblo Lands Act. Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636
 
 
 [2]
 The district court stated that the plats and field notes were filed in 1930. Thompson, 708 F.Supp. at 1210 n. 6. The court, however, cited Defendants' Exhibits E-8 to E-12, which are the plats and field notes for Exceptions 1 to 36. See id.; IV Addendum of Exhibits, Exs. E-8 to E-12. The parties have stipulated that there is no evidence that plats or field notes were ever filed for the overlap land. Stipulation of the Parties, R. tab 766 at 5, p 5. We therefore assume that the district court's statement referred only to the specific parcels listed in Exceptions 1 to 36
 
 
 [3]
 Our language in Baca, 844 F.2d at 709 n. 1, is not to the contrary. In Baca, we recognized that § 4 provided a statute of limitations but determined that the PLA did not apply when the Pueblo had no notice of possible non-Indian claims until after the statute had run. Id. We agree with the district court that here "the Pueblo did have notice that the Board was attempting to extinguish title to the overlap land. Notice was evident in the Board's § 2 report; the § 3 quiet title action, the complaint to which was based on the Board's § 2 report; and the Board's § 6 report which listed the Pueblo's acreage as tens of thousands of acres less than it would have been had the overlap acreage been included." Thompson, 708 F.Supp. at 1215 n. 11
 
 
 [4]
 We are not impressed by plaintiffs' arguments about the alleged failure to include the overlap land in the § 3 quiet title action. In one sense the government did include the overlap land, by disclaiming any title in the Pueblo; having made that determination it had no duty to seek a court judgment of which non-Indians owned what interests in the land. The same is true of the failure to file plats and filed notes under § 13. The Board was not concerned with adjudicating possible disputes among non-Indian owners of tracts in which the Pueblo claimed no ownership, and so it is not surprising that the Secretary did not file a plat delineating the ownership of that land